# UNITED STATES DISTRICT COURT



for the

Eastern District of California

FILED

OCT 07 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

23526 Rosewood Road,
Auburn, California

Case No.

2:13 - SW - 659 CKD

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A-6

located in the ___ EASTERN ___ District of ___ CALIFORNIA ___ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | unlawful manufacturing and dealing in firearms; |
| 18 U.S.C. § 922(g) | unlawful possession of a firearm by a prohibited person; and |
| | (See Affidavit for further offenses and description of offenses) |

The application is based on these facts:

See Affidavit of Special Agent Jerry Donn in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jerry Donn, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/7/2013

_____
*Judge's signature*

City and state: Sacramento, California

Hon. Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## **Affidavit of ATF Special Agent Jerry Donn**

I, Jerry Donn, being duly sworn, hereby depose and state:

## **Purpose**

1.  This Affidavit is made in support of search warrants for:

    a.  LCG AR Parts and Custom Accessories, a business located at 8524 Florin Road, Sacramento, California, as further described in Attachment A-1.

    b.  2004 Michigan Boulevard, West Sacramento, California, as further described in Attachment A-2.

    c.  3541 Sun Maiden Way, Antelope, California, as further described in Attachment A-3.

    d.  C&G Tool Inc., a business located at 910 Striker Avenue, Suite B, Sacramento, California, as further described in Attachment A-4.

    e.  DW Machine Inc., a business located at 950 Riverside Parkway, Suite 70, West Sacramento, California, as further described in Attachment A-5.

    f.  23526 Rosewood Road, Auburn, California, as further described in Attachment A-6.

    g.  1900 Danbrook Drive, Unit #1611, Sacramento, California, as further described in Attachment A-7.

    h.  Rendezvous Primitive Arms, a business located at 28 W. Main Street, Ione, California, as further described in Attachment A-8.

    i.  1240 Stags Leap Road, Placerville, California, as further described in Attachment A-9.

    j.  Raptor Magazines & AR-15 Supplies, a business located at 5542 E. Kings Canyon Road, Fresno, California, as further described in Attachment A-10.

    k.  1515 N. Willow Avenue, Fresno, California, as further described in Attachment A-11.

I believe there is probable cause to believe that the above-identified locations contain evidence, fruits, proceeds, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (unlawful dealing in firearms); 18 U.S.C. § 922(d) (unlawful sale of firearm or ammunition to prohibited person); 18 U.S.C. § 922(g) (unlawful possession of a firearm by a prohibited person); 26 U.S.C. § 5861(f) (unlawful manufacturing of a firearm); 26 U.S.C. § 5861(i) (possession of an unserialized firearm); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses). The evidence, fruits, and instrumentalities to be searched for and seized are more fully described in Attachment B, which is attached hereto and incorporated fully herein.

## Agent Background

2. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have been an ATF Special Agent for twelve years. Prior to working for ATF, I was employed as a Deputy United States Marshal with the United States Marshals Service for four years. I have received training in federal firearms laws and regulations at the ATF National Academy and Federal Law Enforcement Criminal Investigator Training Program. I have investigated at least one hundred cases involving federal firearms violations, involving unlawful sales, possession, manufacturing, and transportation of firearms. I have participated in a variety of different aspects of those investigations, including surveillance, undercover operations to conduct controlled purchases of firearms, interviewing suspects, and the execution of search and arrest warrants. I have been the affiant of numerous affidavits for search warrants relating to firearms offenses.

3. I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Investigation Overview

5. ATF has been investigating the unlawful sale and manufacture of firearms in the greater Sacramento area since March 2013. Since March 2013, undercover law enforcement officers and confidential informants have conducted controlled purchases of thirty-four illegally-manufactured firearms.

6. The initial investigation focused on LCG AR Parts and Custom Accessories, a firearms accessories dealer in Sacramento, California. ATF determined that three individuals associated with LCG, LUIS CORTEZ-GARCIA ("LUIS CORTEZ"), EMILIANO CORTEZ-GARCIA ("EMILIANO CORTEZ"), and MICHAEL TURNER, were manufacturing and selling AR-15-style firearms.

7. Subsequent investigation determined that LUIS CORTEZ, EMILIANO CORTEZ, and TURNER are part of a network of individuals in the greater Sacramento area engaged in the manufacturing and sale of firearms. These individuals, including DANIEL

2

CROWNINSHIELD, BRADLEY HAIL, MICHAEL KASPERSON, CRAIG MASON, STEPHEN PHILIP, and RONALD QUILACIO, are:

a. Manufacturing and selling firearms without a license to do so from ATF.
    i. Under 18 U.S.C. § 922(a)(1)(A), "[i]t shall be unlawful for any person – except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms."
b. Manufacturing and selling firearms that are illegal to possess, such as a short-barreled rifle, a machine gun, or a silencer.
    i. Under 26 U.S.C. § 5845, the term "firearm" includes: (1) "a rifle having a barrel or barrels of less than 16 inches in length;" (2) "a machine gun;" and (3) "any silencer."
    ii. Under 26 U.S.C. §§ 5801-5871, for all firearms (as defined in Title 26):
        1. It is prohibited to make such a firearm without filing a written application with the Secretary of the Treasury.
        2. It is prohibited to transfer such a firearm without the approval of the Secretary of the Treasury.
        3. It is prohibited to possess such a firearm unless the firearm is registered and contains a serial number.
c. Manufacturing such firearms without any identifying information, such as a serial number, that can be used to trace the weapon if it is involved in a crime.
    i. Under 18 U.S.C. § 923(i), "licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe."
d. Selling such firearms and ammunition without regard to the prohibited status of the purchaser.
    i. Under 18 U.S.C. § 922(g), it is unlawful for anyone convicted of a felony to possess a firearm (as defined in 18 U.S.C. § 921) or ammunition which has been shipped or transported in interstate commerce.
e. Selling such firearms without any documentation related to the sale.
    i. Under 18 U.S.C. § 922(m), "It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder."

# Technical Background

### Definition of a "Firearm"

8. A "firearm" is "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). This definition includes "the frame or receiver of any such weapon," 18 U.S.C. § 921(a)(3)(B), and "any combination of parts either designed or intended" from which a firearm can be "readily assembled." 18 U.S.C. § 921(a)(4)(C). A "receiver" under 18 U.S.C. § 921(a)(3)(B) includes a "lower receiver."

### The AR-15 Platform

9. An AR-15 is the semi-automatic, civilian-version of the .223-caliber M16 machine gun used by the United States military. Although AR-15 refers to the model produced by Colt (firearms manufacturer), the term "AR-15" is colloquially used to refer to firearms similar to, and based upon, the Colt AR-15. An example of an AR-15-style rifle is depicted below. This image is from ATF's "Police Officer's Guide to Recovered Firearms," accessible at http://www.atf.gov/files/publications/download/p/atf-p-3312-12.pdf.



*Photo 1 - AR-15 rifle (photo unrelated to this case)*

10. An AR-15-style rifle consists of many parts. There are five parts that will be discussed at length in this Affidavit: the (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine. These parts are labeled below.

///

///

///

///

4



*Photo 2 - AR-15 rifle (labeled) (photo unrelated to this case)*

11. Depicted below is a firearm that has been disassembled to isolate the individual parts.



*Photo 3 - AR-15 rifle (disassembled) (photo unrelated to this case)*

12. Most parts for a firearm (e.g. stocks, barrels, magazines) are not subject to regulation by ATF. Accordingly, these parts are often made by individuals and small businesses. For the most part, these gun parts can be bought and sold without reporting the sales and without requiring a background check.

13. The lower receiver is different than common gun parts. As discussed in Paragraph 8 above, a lower receiver is considered a "firearm." That means that the lower receiver, without any other parts at all, is regulated and controlled by ATF the same way as a completed firearm (for example, the AR-15-style rifle depicted above). This also means that the manufacture, sale, transfer, and disposition of lower receivers are regulated by ATF. Depicted below is a lower receiver for an AR-15-style rifle.



*Photo 4 - AR-15 lower receiver (photo unrelated to this case)*

14. To manufacture an AR-15 lower receiver, a manufacturer may start with an AR-15 blank. Depicted below are two AR-15 blanks. An AR-15 blank is not considered a "firearm" by ATF. An AR-15 blank is a metal casting that is eventually converted into an AR-15 lower receiver by a manufacturing process.



*Photo 5 - AR-15 blanks (photos unrelated to this case)*

    a. An AR-15 blank is also colloquially referred to as a "blank," "an 80%," "an 80% blank," "an 80% lower," or "an AR-15 80%." These terms developed based on the perception that the piece of metal was 80% of a firearm, and therefore unregulated by ATF. The term "80%" and variations of it are not used by ATF

and are not officially recognized by ATF.  ATF regulates "firearms."  An item that is not a "firearm" is not regulated by ATF and not assigned an official terminology.

b.  For purposes of this Affidavit, the term "AR-15 blank" will be used.  At various points in this Affidavit, individuals will be quoted referring to an "80%."  This is unavoidable due to the necessity of using the precise quoted language.  Where possible, however, I have added clarifying parentheticals to remind the reader that "80%" and variations of that term refer to an AR-15 blank.

15. An AR-15 blank is converted into an AR-15 lower receiver through the use of specialized tools, typically a drill press or a computer numerical control machine ("CNC machine"), and precision measurement equipment.  A CNC machine is an automated version of a drill press that is run by a computer.  A drill press is operated by hand.  A CNC machine is operated by running a computer program that automates the process.

///

///

///

///

///

///

///

///

7

16. Using either a drill press or a CNC machine, the equipment operator drills, cuts, or mills cavities in specific locations on the AR-15 blank. Compare the AR-15 blank depicted below left with the AR-15 lower receiver depicted below right. This process transforms the AR-15 blank into an AR-15 lower receiver by creating the precise shape and space necessary for the lower receiver to accept the parts that will allow the firing of a projectile. These shapes or cavities must be created to the exact specifications required. If these cavities are not formed to the exact specifications required, the firearm will not function and may break. This process also creates the holes necessary to attach the upper receiver and barrel to the lower receiver. These parts (e.g. the hammer, bolt or breechlock, and firing mechanism) are the internal mechanical parts, that combine with a trigger, firing pin, and other parts to form a functioning firearm.



**AR-15 blank prior to milling**

**AR-15 blank after to milling, now considered a lower receiver**

*Photo 6 - (clockwise from top left) AR-15 blank, AR-15 lower receiver,*
*AR-15 lower receiver (top view) (photos unrelated to this case)*

17. This investigation deals with the manufacturing of AR-15-style lower receivers. In this case, individuals purchase AR-15 blanks (unregulated, metal castings) and transform them into AR-15 lower receivers (regulated firearms) and then assemble fully functional AR-15 rifles and pistols (regulated firearms). Unlike a firearm manufactured by a licensed manufacturer, these firearms are completely untraceable. They have no serial number. They have no manufacturer identification. Further, these firearms are sold by unlicensed individuals with no regard to the prohibited status of the purchaser, or the legality of the firearm itself.

8

*Federal Firearms License*

18. A person who manufactures and sells firearms is required to hold a federal firearms license ("FFL") in accordance with 18 U.S.C. § 923(a).[1]  As an FFL, the licensee is required to mark the firearms the FFL manufactures in accordance with 18 U.S.C. § 923(i) and its implementing regulation at 27 C.F.R. § 478.92, which prescribes the identifying markings (including serial number and manufacturer name) and the manner in which each firearm is to be marked.  Additionally, 18 U.S.C. § 923(g)(1)(A) and its implementing regulation at 27 C.F.R. § 478.123 prescribe record keeping requirements to require the licensee to record specified information regarding the firearms manufactured and information to whom the firearms are transferred.

    a. In this particular case, all involved individuals (with one exception – Michael KASPERSON) are operating without a license.  KASPERSON is operating in contravention of his license.  All involved individuals are participating in a conspiracy to manufacture firearms without marking such firearms with a serial number and without recording the number of firearms produced or sold.

19. Upon transfer of a firearm to a person who does not hold an FFL, the licensee transferring the firearm is required to execute a Firearms Transaction Record (ATF Form 4473) and initiate a background check on the non-licensed individual in accordance with 18 U.S.C. § 923(g)(1)(A) and 18 U.S.C. § 922(t) and their implementing regulations at 27 C.F.R. §§ 478.124 and 478.102.

    a. In this particular case, firearms are being sold without a license, being sold without filling out an ATF Form 4473, and without conducting a background check.

20. The requirements to hold an FFL apply to any person who is engaging in the business of manufacturing and/or selling firearms.  This has created a loophole that permits an individual to manufacture a firearm for personal use without first obtaining an FFL, provided the firearm is not for sale and the person who made the firearm is not otherwise prohibited from possessing firearms. (*See* Question A6, Federal Firearms Regulations Reference Guide, ATF Publication 5300.4, Revised September 2005, page 176.)  This loophole only applies to personal use.  Thus, only an FFL can manufacture a firearm for sale or transfer.

---

[1] An "FFL" is colloquially used to describe both the license issued by ATF ("Smith and Wesson has an FFL.") and also to refer to the individual or business that holds the license, i.e. the licensee ("Smith and Wesson is an FFL.").

## Statement of Probable Cause

### A.    March 19, 2013 – Initial Contact with LCG

21. On March 19, 2013, an undercover law enforcement officer ("UC#1") visited LCG AR Parts and Custom Accessories ("LCG"), located at 8524 Florin Road, Sacramento (Attachment A-1). LCG is a small gun parts store located within a larger commercial plaster retail store. At LCG, UC#1 was met by MICHAEL TURNER. UC#1 asked TURNER about firearms. TURNER informed UC#1 that UC#1 could purchase an AR-15 blank at LCG and "mill it out"[2] in the back of the shop the same day – essentially creating a firearm from scratch.

### B.    April 3, 2013 – Initial Purchase of an AR-15 from LCG

22. On April 3, 2013, UC#1 met TURNER at LCG. UC#1 removed an AR-15-style pistol[3] off the display wall of LCG and explained that he wanted to model the pistol after the one on display. TURNER handed UC#1 an AR-15 blank that was made of aluminum. UC#1 asked how long it takes to make the AR-15 blank into a firearm. TURNER informed UC#1 that such a firearm could be made in about two hours. TURNER informed UC#1 that UC#1 would drill five holes and then "Jimmy" would "clean it up." TURNER is pictured below in a screenshot from the video recorded by UC#1.



*Photo 7 - TURNER at LCG - Screenshot from video taken by UC#1*

---

[2] As discussed in the background section above, milling is the process of creating the cavity in the AR-15 blank that allows for the placement of internal parts and the attachment of the upper receiver.

[3] Under 18 U.S.C. § 921(a)(7) and 26 U.S.C. § 5845, a "rifle" is "a weapon designed . . . and intended to be fired from the shoulder." The term "pistol" is not statutorily defined, but rather is a broad term to define firearms that are not rifles. An AR-15 is traditionally designed as a rifle, however, an AR-15 without a stock does not meet the statutory definition of a rifle and is therefore referred to as a pistol.

23. TURNER identified "Jimmy" (individual later identified as EMILIANO CORTEZ) and indicated UC#1 should follow EMILIANO CORTEZ. EMILIANO CORTEZ and TURNER guided UC#1 out of the firearm shop (located within the plastering business) towards the back of the business. Upon arriving at the rear of the business, TURNER told UC#1 that EMILIANO CORTEZ was going to set the AR-15 blank into a "jig."[4] TURNER informed UC#1 that UC#1 would have to drill five holes in the AR-15 blank, and then EMILIANO CORTEZ would mill the remainder to complete the receiver. UC#1 was directed to use a drill press and instructed how to operate the drill press – in essence, UC#1 was operating the drill press as a surrogate for EMILIANO CORTEZ – EMILIANO CORTEZ directed each and every move made by UC#1. EMILIANO CORTEZ would motion to the UC#1 when to stop and reposition the AR-15 blank. Subsequently, TURNER took UC#1 back to the front of LCG and informed UC#1 that EMILIANO CORTEZ would finish the receiver within the next hour and a half.

    a. I believe EMILIANO CORTEZ had UC#1 operate the drill to create the fiction that UC#1 was "manufacturing" his own firearm, i.e. UC#1 used his own hands in some part of the creation of the firearm.

    b. According to the Department of Homeland Security, EMILIANO CORTEZ is a Mexican national who has previously been deported and is illegally present within the United States. Further, EMILIANO CORTEZ is a convicted felon. In 2010, in Nevada County, California, EMILIANO CORTEZ was convicted of possession of an assault weapon and sentenced to sixteen months in prison.

24. While UC#1 waited for EMILIANO CORTEZ to finish the receiver, he and TURNER continued to discuss firearms. TURNER informed UC#1 that TURNER had gone to "C&G" (later identified as C&G Tools Inc.) and milled out his own AR-15 lower receiver. TURNER informed UC#1 that the C&G shop had a CNC machine and that C&G could mill out the receiver in twelve minutes. UC#1 asked TURNER about assembling the firearm, and TURNER replied that if UC#1 bought all the parts at LCG, then someone at LCG would assemble everything for UC#1.

25. TURNER told UC#1 that "Jimmy" would fit parts into the newly created AR-15 lower receiver before bringing it out. TURNER also informed UC#1 that "Jimmy" runs a separate business called "Bull Magazines." TURNER said that "Jimmy" dealt more with AK-47 parts and magazines.

---

[4] A "jig" is a metal piece that fits around the AR-15 blank. The jig serves as a pattern or guide so that the operator knows where to drill the holes into the AR-15 blank.

11

26. During this time, another customer asked TURNER how much it would cost to mill an AR-15 blank. TURNER informed the customer it would cost $90 with "Jimmy" or the customer could go to "Dan" (believed to be DANIEL CROWNINSHIELD) at C&G who would charge $100-120 and do the milling in twelve minutes. UC#1 asked TURNER how he educated himself on guns. TURNER said that he watches videos on the internet and reads gun forums like "Cal Guns" on the internet.[5]

27. Eventually, EMILIANO CORTEZ returned. EMILIANO CORTEZ handed TURNER the completed lower receiver. UC#1 paid EMILIANO CORTEZ $110 for the milling on the lower receiver.

28. On April 4, 2013, UC#1 returned to LCG and purchased an upper receiver to pair with the lower receiver that UC#1 had purchased the previous day at LCG. While he was at LCG, UC#1 overheard TURNER tell a customer, "you can buy this [holding an AR-15 blank], buy an upper, buy magazines, get ammo and be shooting before the day is up." UC#1 paid $949 for an upper receiver and additional accessories.

## C. April 17, 2013 – Purchase of AR-15 by Prohibited Person

29. On April 17, 2013, an ATF Confidential Informant ("CI#1") went to LCG. CI#1 advised TURNER that CI#1 wanted to purchase an "80%" (an AR-15 blank). CI#1 showed TURNER a photocopy of an April 4, 2013 advertisement in the Sacramento News and Review, where LCG offered to sell AR-15 blanks for $169. TURNER acknowledged the advertisement, confirmed the sales price of $169, and presented an AR-15 blank to CI#1. In response, CI#1 told TURNER that CI#1 wanted to build an AR-15 pistol using the AR-15 blank. TURNER then described to CI#1 the process of machining and drilling an AR-15 blank into a completed lower receiver and building the pistol, all within that same day. TURNER advised that after CI#1 purchased the AR-15 blank, CI#1 would pay EMILIANO CORTEZ $90 and then go to the back with him. Thereafter, EMILIANO CORTEZ would "finish cleaning it out and make sure the trigger group fits," thus completing the lower receiver. TURNER concluded that CI#1 would purchase the remaining parts necessary to build out and assemble a functional AR-15 pistol and then go shooting. CI#1 agreed to pay $507 for machining and drilling the AR-15 blank into a completed lower receiver and purchasing the required firearm parts for it. CI#1 asked TURNER if the AR-15 pistol could be built that same day. TURNER responded that "as long as we can get him [EMILIANO CORTEZ] back there to carve it, you [CI#1] can be leaving here within the next two hours with a complete gun ready to shoot."

---

[5] "Cal Guns" is a website where firearm enthusiasts can discuss firearms, firearm laws, and/or arrange to buy, sell, and trade firearms and firearm parts with each other.

a. CI#1 is working for ATF for monetary compensation. CI#1 has worked with law enforcement for the past eight years. Information provided by CI#1 has proven to be accurate and reliable. In 1993, CI#1 was convicted of robbery (second degree), attempted robbery (second degree), and assault with a firearm. In 2008, CI #1 was convicted of possession with intent to distribute marijuana (21 U.S.C. § 841(a)(1)) and carrying a firearm in furtherance of a drug trafficking offense (18 U.S.C. § 924(c)).

30. TURNER advised LUIS CORTEZ (EMILIANO CORTEZ's brother) that CI#1 was going to "buy everything, gonna do it right now." LUIS CORTEZ informed TURNER that the cost of an upper receiver for CI#1's AR-15 pistol was $880. Then TURNER told CI#1 that the total for the complete AR-15 pistol would be $1,388 ($507 for the lower receiver and parts plus $880 for the upper receiver and parts).[6] CI#1 agreed to the price. Additionally, TURNER informed CI#1 that an additional $90 would need to be paid to EMILIANO CORTEZ.

a. According to the Department of Homeland Security, LUIS CORTEZ is a Mexican national that is illegally present within the United States. A screenshot from the video recorded by CI#1 of LUIS CORTEZ handling the AR-15-style pistol is depicted below.



*Photo 8 - LUIS CORTEZ at LCG - Screenshot from video taken by CI#1*

---

[6] Throughout this interaction, the prices quoted by TURNER and LUIS CORTEZ varied. For example, TURNER initially told CI#1 that the price of a lower receiver would be $507, but then later TURNER said the price was $508, and still later CI#1 was ultimately charged $510. I believe that the variations of prices is based on the fact that LCG does not label items with prices and LCG is operating "off the books" (i.e. does not use a cashier register to record prices or sales).

13

31. TURNER explained to CI#1 that "you're gonna deal with him [EMILIANO CORTEZ], he's gonna set the mill up, you're just gonna pull the handle down, it's gonna go . . . tell you to go so deep and it's gonna do, you know, five holes along that body." TURNER continued that once CI#1 was done drilling the five holes, then EMILIANO CORTEZ was "gonna finish cleaning it out." Shortly thereafter, CI#1 was directed to begin drilling the five holes into the AR-15 blank. For each of the five holes, EMILIANO CORTEZ would start drilling the hole for CI#1 and then CI#1 would finish it.

32. Later, after the drilling was complete, TURNER instructed CI#1 on how to explain a completed lower receiver with no identifying marks or serial number to law enforcement if CI#1 was ever stopped by law enforcement.[7] During his instruction, TURNER advised CI#1 of the following: a lower receiver derived from an AR-15 blank was not required to have a serial number or be registered, however, the best thing to do was for CI#1 to mark the lower receiver with CI#1's driver license number or identification number because it would satisfy law enforcement.

33. Subsequently, LUIS CORTEZ walked into LCG with a fully-assembled AR-15 pistol in hand. LUIS CORTEZ instructed CI#1 on how the pistol functioned and how to operate it. TURNER then advised LUIS CORTEZ that the total owed by CI#1 was $1,389. CI#1 then paid LUIS CORTEZ $1,390. LUIS CORTEZ then advised CI#1 that the AR-15 pistol had a one-year warranty and added that if "anything breaks, we give new one." CI#1 confirmed with LUIS CORTEZ that CI#1 could contact him using the contact number, 916-601-4544, that appeared on a LCG business card that was provided to CI#1.

34. While CI#1 was still in the store, another customer commented that CI#1's AR-15 pistol was not marked with a serial number. TURNER confirmed the customer's observation and advised that if a person was to personally make an AR-15 rifle/pistol from an AR-15 blank for personal use, then the firearm was not subject to registration. Several minutes later, CI#1 departed from LCG in possession of an AR-15 pistol, two boxes of ammunition, and a large-capacity magazine. At no point was CI#1 required to fill out a background check form or complete any paperwork that is required by ATF prior to the purchase of a firearm.

///

---

[7] As discussed in the background section above, a firearm must have a serial number and manufacturer identification prior to sale or transfer.

14

### D.   April 17, 2013 – Purchase of AR-15 by UC#1

35. Also on April 17, 2013, UC#1 purchased an AR-15 rifle from LUIS CORTEZ,
EMILIANO CORTEZ, and TURNER at LCG. Upon arrival, UC#1 indicated that he
wanted to purchase an AR-15 rifle. UC#1 was then led to the rear of the shop by LUIS
CORTEZ. In the rear of the shop, EMILIANO CORTEZ had the drill press ready with
an AR-15 blank. UC#1 was instructed to drill holes and then EMILIANO CORTEZ
would readjust the drill press and the AR-15 blank after each hole was drilled. UC#1
requested that the lower receiver be drilled similar to an M16.[8] EMILIANO CORTEZ
confirmed that he would be able to do it and told UC#1 that it would cost $110. UC#1
paid $110 directly to EMILIANO CORTEZ.

36. While at LCG and waiting for his firearms to be finished, UC#1 spoke with another
customer about where the customer had bought his AR-15 blank. The customer replied
that he purchased it at the Vallejo Gun Show and had it milled at a shop called "C&G."
The customer also mentioned that the owner of "C&G" was a member on "Cal Guns"
and is referred to as "DRDEATH" on the website.

37. LUIS CORTEZ then returned with the milled lower receiver (i.e. the AR-15 blank was
now, through the process of machining, a completed lower receiver) and started testing
different magazines for the proper fit. After LUIS CORTEZ had assembled the firearm,
UC#1 paid $1570 to LUIS CORTEZ for the firearm, magazine, and ammunition. UC#1
left LCG with a fully functional AR-15-style rifle.

### E.   April 25, 2013 – ATF Letter Ruling

38. On April 25, 2013, CI#1 visited LCG and purchased two AR-15 blanks from LUIS
CORTEZ. CI#1 inquired about converting the AR-15 blanks into firearms. TURNER
advised CI#1 that they [LCG] were no longer going to machine and drill AR-15 blanks
into completed lower receivers and that CI#1 was going to have to do it. TURNER
continued that this change was because of a "DOJ" announcement stating that it was
illegal for them to show customers how to do the machining and drilling and be paid for
it.

   a. On April 12, 2013, ATF responded to an inquiry by Ares Armor Metal Works,
      LLC requesting ATF's position on whether their proposed operations constituted
      manufacturing of firearms. ATF's letter in response is attached as Exhibit 1 and

---

[8] As discussed above, an M16 is the fully automatic version of the AR-15. UC#1 was requesting that the AR-15
blank be drilled in such a fashion to accept parts capable of making the firearm fully automatic as opposed to semi-
automatic.

incorporated herein. The April 12, 2013 ATF letter was posted on Cal Guns. I believe that this is the "DOJ" letter to which TURNER was referring.

39. When CI#1 approached LUIS CORTEZ about the information provided by TURNER, LUIS CORTEZ advised that his brother (EMILIANO CORTEZ) was afraid to touch "the machine" (referring to the machine used to mill the AR-15 blanks). LUIS CORTEZ informed CI#1 that numerous customers had been calling and LUIS CORTEZ had informed them that he no longer did "it" anymore (referring to the machining and drilling of AR-15 blanks).

40. LUIS CORTEZ advised CI#1 to call "Steve" (later identified as Stephen PHILIP). LUIS CORTEZ assured CI#1 that "this guy [PHILIP], he do it." When CI#1 asked LUIS CORTEZ and TURNER about whom to mention as referring CI#1 to "Steve," they both instructed CI#1 to say that "Mike from LCG" made the referral.

41. CI#1 attempted to call PHILIP but PHILIP did not answer. CI#1 advised LUIS CORTEZ that CI#1 was unable to make contact with PHILIP and that CI#1 wanted to purchase two AR-15 blanks if LUIS CORTEZ could get a hold of PHILIP to conduct the milling. LUIS CORTEZ responded that he was going to call "Craig" (later identified as Craig MASON). While in the presence of CI#1, LUIS CORTEZ called MASON via cell phone and advised him that he [LUIS CORTEZ] was "going to send somebody, [CI#1] wants to do two 80s ok." LUIS CORTEZ reiterated to MASON that "[CI#1] wants to do two 80s, carve it out." LUIS CORTEZ then told TURNER that he called Craig MASON. TURNER responded that the "first one I ever did was with Craig."

### F.   April 25, 2013 – MASON Manufactures Two AR-15 Lower Receivers

42. Later on April 25, 2013, CI#1 travelled to MASON's residence at 23526 Rosewood Road, Auburn, California (Attachment A-6). After meeting MASON, the two conversed and CI#1 advised MASON that CI#1 had been incarcerated in state prison and MASON responded he was not concerned about it. MASON directed CI#1 inside into a large workshop on his property. CI#1 showed MASON the two AR-15 blanks that CI#1 wanted to mill. MASON then advised CI#1 that CI#1 was going to conduct the machining and drilling and that MASON's role was to ensure CI#1's safety and that CI#1 conducted the work properly. Pictured below is a screenshot from a video recorded during CI#1's interaction with MASON. This photograph shows the AR-15 blank fitted in a jig on a drill press.



*Photo 9 - Drill Press Operation at MASON's shop*

43. MASON asked CI#1 if the AR-15 blanks were for CI#1, to which CI#1 answered that
they were. CI#1 machined the first of the AR-15 blanks with the assistance and guidance
of MASON. MASON advised CI#1 that "the Feds are cracking down on this stuff . . . on
the 'CNC' guys especially."

44. After the first AR-15 blank was complete, MASON installed various internal AR-15 gun
parts to determine if the lower receiver was machined correctly. Once completed, CI#1
began to mill the second AR-15 blank with the assistance and guidance of MASON.
CI#1 observed MASON carrying a pistol on his person. When CI#1 addressed the matter
with MASON, MASON advised CI#1 that the pistol was a Springfield XD, it was .40-
caliber, and that he possessed a State of California carry concealed weapon ("CCW")
license. MASON further advised that all the other firearms he possessed, except those
under his CCW license, were not registered because he did not believe in having to do so.
Below is a screenshot of MASON operating a drill press during his interaction with CI#1.



*Photo 10 - MASON operating a drill press*

17

45. CI#1 and MASON completed the machining and drilling of the second AR-15 blank. MASON then installed various internal AR-15 gun parts into the lower receiver to determine if it was machined correctly. After MASON made some minor adjustments to the lower receiver, he advised CI#1 to pay him $250 for his services. CI#1 provided MASON payment and walked out of the workshop/warehouse with the two completed AR-15 lower receivers.

46. On April 29, 2013, CI#1 returned to LCG to purchase the necessary parts and accessories to build a complete AR-15. CI#1 asked LUIS CORTEZ to assemble the firearm. LUIS CORTEZ initially took CI#1's lower receiver and attached an adjustable stock and short barrel. LUIS CORTEZ then held up an assembled short-barreled rifle and told CI#1 that this firearm was an illegal short-barreled rifle. At the same time, LUIS CORTEZ told another customer in the shop that LUIS CORTEZ's brother (EMILIANO CORTEZ) was incarcerated for eighteen months for possessing a short-barreled AR-15 rifle that was similar to the one LUIS CORTEZ had just displayed to CI#1. CI#1 asked LUIS CORTEZ to assemble the firearm with a longer barrel so that the firearm would be legal. LUIS CORTEZ then assembled both of CI#1's AR-15 rifles and handed the firearms to CI#1. CI#1 paid $2,000 and then left LCG with the two completed AR-15-style rifles (pictured below).



*Photo 11 - Two AR-15 rifles purchased on April 29, 2013*

### G.    April 29, 2013 – Introduction to Ronald QUILACIO

47. Also on April 29, 2013, UC#2 (an undercover ATF agent) purchased one AR-15 blank from LUIS CORTEZ at LCG. While at LCG, UC#2 met another customer named

18

Ronald QUILACIO. QUILACIO told UC#2 about an individual in West Sacramento named "Steve" (later identified as Stephen PHILIP). QUILACIO said that PHILIP charged him $75 to mill his AR-15 blank into an AR-15 lower receiver. QUILACIO gave PHILIP's phone number to UC#2 and said that when UC#2 contacted PHILIP, UC#2 would get a better price on the mill work if UC#2 mentioned that UC#2 obtained PHILIP's phone number from "Cal Guns."

48. QUILACIO also told UC#2 that he had an AR-15 blank in his car that was for sale. QUILACIO said the AR-15 blank was not milled because he "can't legally get rid of it once it has been milled." QUILACIO further explained that once it is milled, it is legally considered to be a firearm and at that point it is illegal to sell unless it is stamped and the purchaser goes through a background check. UC#2 asked QUILACIO if he worked on firearms and could build UC#2 a rifle from an AR-15 blank. QUILACIO told UC#2 that he did work on firearms and could build UC#2 a rifle. UC#2 went with QUILACIO to QUILACIO's vehicle, a Subaru Impreza WRX that was parked in the parking lot. QUILACIO removed an AR-15 blank from the trunk of his vehicle. Subsequently, UC#2 paid QUILACIO $130 for the AR-15 blank. QUILACIO instructed UC#2 to take the AR-15 blank to PHILIP who would mill it and then bring the completed lower receiver back to QUILACIO so he could build it into a functional AR-15-style rifle for UC#2. QUILACIO commented to UC#2 that, "I never did it for you [UC#2] because you built it yourself." This statement lead UC#2 to believe that QUILACIO knew his actions were illegal and he wished to avoid problems with law enforcement should UC#2 ever be questioned about the firearm. Following this exchange, UC#2 continued to communicate via text messages and phone calls with QUILACIO.

### H.   May 3, 2013 – Dan CROWNINSHIELD and C&G Tool, Inc.

49. Following the April 3 and April 17, 2013 referrals to Dan CROWNINSHIELD and C&G Tool, ATF conducted a controlled purchase on May 3, 2013. During the controlled purchase, UC#1 purchased two AR-15 lower receivers and one AR-10[9] lower receiver from Dan CROWNINSHIELD, the owner of C&G Tool Inc., 910 Striker Avenue, Suite B, Sacramento, California ("C&G") (Attachment A-4).

50. On May 3, 2013, upon arriving at C&G, UC#1 met with CROWNINSHIELD. While UC #1 was talking with CROWNINSHIELD, an employee told CROWNINSHIELD that another customer had an appointment at the shop at 3 pm. CROWNINSHIELD said (to the employee) that he hoped the guy wanted three black lowers and one gray one. The employee seemed surprised that was the only inventory.

---

[9] An AR-10 is a different model firearm that fires larger-sized ammunition than the AR-15 model.

51. UC#1 then asked if CROWNINSHIELD had AR-15 blanks for sale.
CROWNINSHIELD led UC#1 to the office where CROWNINSHIELD showed UC#1
AR-15 blanks and AR-10 blanks that were available. UC#1 asked CROWNINSHIELD
how long it would take to mill the blanks into completed lower receivers.
CROWNINSHIELD responded that the process could be completed in under 20 minutes.
UC#1 told CROWNINSHIELD that UC#1 would buy two AR-15 blanks and one AR-10
blank. UC#1 paid $920, covering the cost of the AR-15 and AR-10 blanks, as well as the
machine work on all three blanks to convert them into lower receivers.

52. CROWNINSHIELD directed UC#1 to a large table near one of the CNC machines[10].
CROWNINSHIELD took the AR-15 blank purchased by UC#1 and placed it into a jig
that fit around the AR-15 blank. UC#1 informed CROWNINSHIELD that UC#1 has not
done this before. CROWNINSHIELD responded if he went too fast just tell him to start
over. CROWNINSHIELD then guided UC#1 to load the AR-15 blank into the CNC
machine, close the door, and hit a specific button to start the machine. UC#1 asked
CROWNINSHIELD how much the CNC machines cost and CROWNINSHIELD said a
couple hundred thousand. CROWNINSHIELD added that the CNC machines were paid
off.

53. Once the CNC machine process was completed, CROWNINSHIELD then instructed
UC#1 on how to drill the first AR-15 blank; UC#1 then completed some of the drilling on
a drill press. With the assistance of CROWNINSHIELD, UC#1 completed the drilling
on all three blanks. Upon completion of the drilling, UC#1 left C&G with two completed
AR-15 lower receivers and one AR-10 lower receiver.

## I.     May 4, 2013 – Manufacture of AR-15 at DW Machine

54. Based on QUILACIO's statements to UC#2 that PHILIP at DW Machine would convert
an AR-15 blank into an AR-15 lower receiver, UC#2 set up an appointment with PHILIP.
On May 4, 2013, UC#2 met with PHILIP at DW Machine (Attachment A-5). When
UC#2 arrived, he observed two other individuals in the process of converting AR-15
blanks into AR-15 lower receivers using a CNC machine. UC#2 also observed DW
Machine co-owner Dean Wilson.

55. While waiting to use the CNC machine, UC#2 met with DW Machine co-owner Dean
Wilson. Wilson inspected the two AR-15 blanks that UC#2 had brought with him.

---

[10] As discussed above, a CNC machine functions much like an automated drill press that is operated by a computer
program.

Wilson immediately recognized one AR-15 blank as being from LUIS CORTEZ. Wilson said that he had seen just about every kind of blank. Wilson stated that he and PHILIP were converting five-to-ten blanks into lower receivers every Saturday and that they may increase the number because "it's a good money maker."

56. Later UC#2 met again with PHILIP. PHILIP inspected the AR-15 blanks. PHILIP recognized that one of the AR-15 blanks was from "Bear Arms Custom" (believed to be Beararms Customs, a business run by Bradley HAIL). UC#2 and PHILIP then discussed the milling process using the CNC machine. PHILIP told UC#2 that the program on the CNC machine would mill out the AR-15 blank to accept M16 parts – that is, the AR-15 lower receiver could be readily converted into a fully-automatic M16.

57. UC#2, under the direction of PHILIP, placed an AR-15 blank into the CNC machine. Then, UC#2 was instructed by PHILIP to press a button to start the CNC machine process. During this process, UC#2 told PHILIP that UC#2 was selling the firearms that he was producing. PHILIP replied, "you can't sell these . . . technically." UC#2 said that there were no identifying marks on the firearms. PHILIP responded, as long as UC#2 didn't get caught. After the first AR-15 blank was finished, UC#2 put the second AR-15 blank into the CNC machine.

58. After both AR-15 blanks had been converted into AR-15 lower receivers, UC#2 paid PHILIP $160. UC#2 asked PHILIP if DW Machine sold AR-15 blanks. PHILIP replied that DW Machine sold AR-15 blanks for $150, but they would not "finish" their own AR-15 blanks (i.e. convert the AR-15 blanks into an AR-15 lower receiver).

   a. Note: PHILIP converted two AR-15 blanks into AR-15 lower receivers for UC#2 using AR-15 blanks that UC#2 had purchased elsewhere. At the same time, PHILIP told UC#2 that PHILIP would sell his own AR-15 blanks but would not convert them. I believe that PHILIP did this to continue the fiction that he was not manufacturing firearms. In essence, PHILIP (and others) believed that by separating the sale of AR-15 blanks from the conversion of AR-15 blanks into lower receivers, they were neither selling nor manufacturing a firearm.

### J.      May 6, 2013 – QUILACIO Sells a Short-Barrel Rifle to UC#2

59. On May 6, 2013, UC#2 met with QUILACIO at QUILACIO's residence, located at 1900 Danbrook Drive, Unit 1611, Sacramento, California (Attachment A-7). UC#2 brought two AR-15 lower receivers to the meeting with the intention of having QUILACIO complete the assembly of the AR-15 rifles. UC#2 explained to QUILACIO that in addition to having the two firearms built (using the lower receivers that UC#2 had

21

brought with him), UC#2 would like to purchase another completed lower receiver from QUILACIO.

60. Shortly thereafter, UC#2 and QUILACIO traveled together to LCG in UC#2's vehicle. While en route, UC#2 approached QUILACIO about partnering in the production and sale of AR-15 rifles. QUILACIO said he has a "buddy" who produced AR-15 blanks and if UC#2 ordered twenty or more AR-15 blanks, the price for each would be $110. UC#2 asked if QUILACIO would be interested in UC#2's business proposal and told QUILACIO not to participate if he was not comfortable with the business proposal. QUILACIO said he was interested in working with UC#2 and that he was comfortable because he was just selling parts.

    a. While in transit, QUILACIO told UC#2 that his girlfriend carries a firearm on her person while inside their residence. QUILACIO said he also keeps a firearm ready to go while inside his residence.

    b. UC#2 asked QUILACIO if QUILACIO had access to silencers. QUILACIO suggested the UC#2 use the silencer system sold at LCG. The silencer system consists of a nut connecting an oil filter to the end of the barrel of the firearm. The nut was sold at LCG and the oil filter could be purchased at an auto parts store.

61. Upon arriving at LCG, UC#2, with the assistance of QUILACIO, purchased the necessary parts to complete the assembly of UC#2's two firearms. QUILACIO and UC#2 then returned to QUILACIO's apartment to complete the assembly. At QUILACIO's apartment, QUILACIO began to assemble the firearms. QUILACIO could not get the short upper receiver to meet up with the lower receiver provided by UC#2. QUILACIO replaced the lower receiver provided by UC#2 with a different lower receiver that QUILACIO had in his apartment. QUILACIO advised UC#2 that what he had just made was a short-barreled rifle and that it was illegal. QUILACIO took one of the magazine repair kits[11] and assembled it completing an illegal large-capacity magazine. QUILACIO stated that his assembly of the large-capacity magazine was a felony in California. QUILACIO advised UC#2 to remove the bottom plate of the magazine for transport because it is not considered "assembled" in that configuration. UC#2 paid QUILACIO $2,460 for the parts and labor and left with three firearms, including a short-barreled rifle.

---

[11] A magazine repair kit contains all of the necessary parts to assemble a magazine. Under a loophole in California state law, an individual can purchase a repair kit for a high capacity magazine that contains each and every part for a high capacity magazine, but that individual cannot assemble these parts to make a high capacity magazine. Under the loophole, the parts kit is only to be used to repair a grandfathered high capacity magazine.

a. Under 26 U.S.C. § 5861, it is unlawful to possess a short-barreled rifle unless it is registered and contains a serial number. Under 26 U.S.C. § 5845(a), a short-barreled rifle is defined as a rifle having a barrel length of less than sixteen inches.

b. ATF agents subsequently measured the barrel-length of the short-barreled rifle sold by QUILACIO and determined it to be 12.25 inches long.[12]

### K.   May 28, 2013 – QUILACIO Introduces Bradley HAIL

62. Prior to May 28, 2013, UC#2 arranged to purchase twenty AR-15 blanks from QUILACIO. On May 28, 2013, UC#2 met QUILACIO at a Chevron gas station in Sacramento. QUILACIO brought twenty AR-15 blanks in the trunk of his Subaru Impreza WRX. UC#2 paid QUILACIO $2,200 for the twenty AR-15 blanks.

63. During this meeting, UC#2 told QUILACIO that UC#2 wanted the finished firearms cerakoted.[13]  QUILACIO used his cellular phone to call an individual later identified as Bradley HAIL to discuss cerakoting the firearms. QUILACIO arranged to meet HAIL later that afternoon. QUILACIO stated that HAIL gives the firearms to his friend (FNU LNU #6[14]) to cerakote and that the twenty AR-15 blanks were produced by HAIL and HAIL's friend (LNU #6). QUILACIO said he could vouch for HAIL because they have done "hundreds of lowers" together and they have done "ten to fifteen grand in sales."

64. Still in the presence of UC#2, QUILACIO called "Steve" (PHILIP) and said, "hey Steve, this is Ron from Cal Guns" and asked PHILIP when he had time to mill the twenty AR-15 blanks that QUILACIO had just sold to UC#2. PHILIP said he could mill them the following day but would call QUILACIO back. When PHILIP called back, he and QUILACIO arranged to have the blanks milled on May 31, 2013. QUILACIO confirmed that PHILIP would be milling the AR-15 blanks into AR-15 lower receivers at a price of $75 each. UC#2 asked QUILACIO to get the twenty AR-15 blanks milled and QUILACIO agreed but stated he would charge UC#2 for his time.

---

[12] The barrel length of a rifle is determined pursuant to ATF Order 3310.4B. Order 3310.4B sets out that barrel length is measured from "the face of the bolt, breech, or breechlock" to the "muzzle end." A removable barrel extension (e.g. poly-choke, flash suppressor, or silencer) are not part of the measured length of a barrel, however, permanently attached extensions are considered part of the barrel.

[13] Cerakoting is a process of coating a firearm with a ceramic-like substance. This is often done to give a newly-manufactured firearm a rough, matte surface that is similar to a traditionally manufactured firearm, rather than a smooth, metallic surface of an AR-15 blank.

[14] Throughout this investigation various individuals have been labeled as FNU LNU (first name unknown, last name unknown) because their real identity is not known. Although not all of these individuals are discussed in this Affidavit, to maintain consistency across different reports the original numbering has been maintained.

65. Later on May 28, 2013, UC#2 followed QUILACIO to a parking lot off of Latrobe Road in El Dorado County. QUILACIO told UC#2 that HAIL would be driving a "lifted Jeep." While waiting, UC#2 and QUILACIO discussed the particulars of their business arrangement to build the twenty AR-15s. Later, HAIL, travelling in a black Jeep Wrangler Unlimited, bearing California license plate 6LUY051, drove into the same parking lot. UC#2, QUILACIO and HAIL discussed the cost of cerakoting the twenty AR-15 blanks. It was agreed that the total cost would be $500 and that UC#2 would pay $250 up front and pay the remaining balance upon completion and delivery. UC#2 gave the twenty AR-15 blanks to HAIL. HAIL reiterated that they would be coated all black and placed the box in his Jeep. Below is a screenshot of HAIL from UC#2's video recording of his interaction with HAIL and QUILACIO.



*Photo 12 - HAIL during May 28, 2013 meeting with UC#2*

66. UC#2 asked HAIL if HAIL repaired firearms. HAIL indicated that he did repair firearms. UC#2 showed HAIL a lower receiver that would not line up correctly with the upper receiver. After some inspection HAIL explained how he would fix the firearm. HAIL said he would have to build a jig to hold the lower receiver and re-mill the receiver. HAIL said the only problem was not the work to repair the firearm, but rather having the time to perform the work because he was currently working on an order of 150 lower receivers. HAIL stated he does not produce AR-15 blanks and mill the same AR-15 blanks into lower receivers because he cannot produce the blank and do the milling, as that would be manufacturing [a firearm] and if ATF caught him he would go to jail.

(NOTE: this is identical to the logic advanced by PHILIP at DW Machine on May 4, 2013.)

67. HAIL said he knew an individual to take the AR-15 blanks to for milling and that HAIL did not have to be there for the milling. HAIL said he could take all twenty AR-15 blanks and drop them off at the "Ione Gun Shop" (believed to be Rendezvous Primitive Arms, 28 W Main Street, Ione, California) and have the AR-15 blanks milled for $70 each. HAIL, however, said that he would have to call and verify that with "Mike" (believed to be Michael KASPERSON). HAIL said "Mike" uses a machine to mill the AR-15 blanks and that his machine is inside the business.

### L.   May 31, 2013 – July 2, 2013 – Production and Delivery of Twenty AR-15-Style Short-Barreled Rifles by Ronald QUILACIO

68. On May 31, 2013, ATF agents conducted surveillance at PHILIP's business, DW Machine, located at 950 Riverside Parkway, Unit 70, West Sacramento, California (Attachment A-5). Based on UC#2's contact with QUILACIO on May 28, 2013, agents knew that QUILACIO scheduled an appointment with PHILIP to convert ten AR-15 blanks into AR-15 lower receivers. Surveillance observed QUILACIO arrive in his Subaru Impreza WRX, exit from the driver's side of the vehicle, open the vehicle's trunk, remove a rectangular cardboard box from the trunk, and walk into DW Machine with the box.

69. Over the course of the next month, UC#2 and QUILACIO met on six separate days. During the course of these meetings, QUILACIO delivered fifteen short-barreled AR-15 rifles and five AR-15 rifles (with barrel lengths exceeding sixteen inches) in exchange for payment of approximately $25,000 in cash. None of these firearms were registered. None of these firearms contained a serial number. And no ATF paperwork or background checks were completed.

   a. On June 3, 2013, UC#2 met with QUILACIO at a Chevron gas station. UC#2 paid QUILACIO $5,000 for the parts and labor to complete the first five AR-15 rifles.

   b. On June 5, 2013, QUILACIO met UC#2 at a Chevron gas station. QUILACIO was driving a red Nissan Versa with California license plate 6KHP715 (registered to Kelly Maroney). QUILACIO gave UC#2 five AR-15-style short-barreled rifles and five large-capacity magazines. QUILACIO asked UC#2 if the people that were buying these items knew what they were getting themselves into (legally)

25

because of the short barrel. QUILACIO stated that he had LUIS CORTEZ test fire each upper receiver. UC#2 paid QUILACIO $2,950. QUILACIO said he likes to communicate via text because "they" (UC#2 inferred this to mean law enforcement) cannot intercept the conversation.

      i. ATF agents subsequently determined that each of the rifles provided by QUILACIO on June 5, 2013, had barrel lengths measuring between eight and ten inches.

      ii. I believe QUILACIO's statement about people knowing what they were getting into indicates that QUILACIO believed UC#2 was reselling the firearms to other people.

c. On June 10, 2013, UC#2 and QUILACIO met twice at the Arden Fair Mall. QUILACIO arrived at the meeting in his Subaru Impreza WRX. In total, QUILACIO gave UC#2 five AR-15-style short-barreled rifles and five large-capacity magazines. UC#2 paid QUILACIO $5,825. During this interaction, QUILACIO said that he and HAIL were discussing selling 1,000 AR-10 blanks in Arizona and distributing them through a website.

d. On June 17, 2013, UC#2 and QUILACIO met in a parking structure. QUILACIO told UC#2 that he had purchased the upper receivers from "Luis" (LUIS CORTEZ). QUILACIO also said that he had to have HAIL return to the Ione, California gun shop (believed to be Rendezvous Primitive Arms) because four of the AR-15 lower receivers were not milled properly. UC#2 paid QUILACIO $6,400. QUILACIO gave UC#2 four AR-15-style rifles. QUILACIO asked UC#2 if he wiped down the firearms prior to delivering them to his customers.

      i. Based on my training and experience, wiping down a firearm is done in order to prevent and/or delay detection by law enforcement via fingerprints. I believe that this demonstrates that QUILACIO believed UC#2 was re-selling the firearms.

///

///

///

///

26

e.  On June 26, 2013, UC#2 met with QUILACIO.  QUILACIO gave two AR-15-
style rifles to UC#2, one of which was short-barreled.  QUILACIO said he still
needed to replace four of the lower receivers that had been poorly milled.
QUILACIO indicated that he would do it at DW Machine on June 28, 2013.
QUILACIO and UC#2 agreed to meet again on July 2, 2013.  QUILACIO gave
UC#2 a small piece of paper with itemized totals and breakdowns for the
firearms.  UC#2 paid QUILACIO $7,000 for the firearms and agreed to pay for
the last four firearms upon receipt.  Below is a screenshot from a video recording
of UC#2's interaction with QUILACIO.



*Photo 13 - QUILACIO during June 26, 2013 meeting with UC#2*

///

///

///

f.  On June 28, 2013, ATF agents conducted surveillance at DW Machine, in order to observe the arrival of QUILACIO. Based on UC#2's contact with QUILACIO on June 26, 2013, agents knew that QUILACIO was going to convert four AR-15 blanks into AR-15 lower receivers at DW Machine on this date. Agents observed QUILACIO's grey Subaru Impreza WRX arrive at DW Machine. QUILACIO then walked into DW Machine while carrying an object that was either contained in a clear plastic bag or wrapped in bubble-wrap. Below is a photograph of QUILACIO entering DW Machine.



*Photo 14 - QUILACIO entering DW Machine on June 28, 2013*

g.  Later this same date, agents observed QUILACIO exit from DW Machine and walk to his vehicle cradling a shiny metallic object with his right hand, right forearm, and body. The object appeared to be wrapped in bubble-wrap.

h.  On July 2, 2013, UC#2 met with QUILACIO for the final delivery. UC#2 paid QUILACIO $2,830. QUILACIO gave UC#2 four AR-15-style short-barreled rifles. QUILACIO told UC#2 that PHILIP was not present for the milling at DW Machine and that QUILACIO had done it with "Dean" (identified as Dean Wilson). QUILACIO further explained that Wilson was the owner of half of the shop (DW Machine). QUILACIO also mentioned that Wilson was developing an AR-10 (a .308 caliber rifle based upon the AR-15 platform).

   i.  ATF agents subsequently determined the firearms provided on July 2, 2013, had barrels lengths measuring between eight and ten inches long.



*Photo 15 – Twenty firearms purchased from QUILACIO*

### M.    July 10, 2013 – Rendezvous Primitive Arms

70. On July 10, 2013, UC#4 went to Rendezvous Primitive Arms ("RPA") and Gold Country Gun Works ("GCGW") located at 28 W. Main Street, Ione, California (Attachment A-8), in order to purchase an AR-15 blank and have it milled out to be an actual firearm. GCGW is the name of Michael KASPERSON's business and the name under which he has a federal firearms license (FFL). GCGW purports to be a separate business within RPA, however, there was no discernible distinction within the business location.

    a.   GCGW's FFL number is 968005076E03610.

    b.   RPA's FFL number is 968005015H02246.

71. Upon entering RPA, UC#4 was informed by an RPA employee (FNU LNU #1, White, female adult) that they sold AR-15 blanks for $159 but if UC#4 wanted to have it milled he would have to see "Mike" (later identified as Michael KASPERSON) who would finish the milling for $75. The employee further stated that KASPERSON was a separate business. UC#4 purchased an AR-15 blank from the RPA employee.

72. UC#4 then met with KASPERSON. KASPERSON told UC#4 that he had one (i.e. an AR-15 lower receiver) ready to go (referring to the lower receiver already being milled out), and he could swap UC#4's AR-15 blank (just purchased) for a milled out one (i.e. an AR-15 lower receiver). UC#4 asked KASPERSON if he had to actually complete some of the milling and KASPERSON said, "It's kind of a myth that you have to do it." KASPERSON told UC#4 that he didn't use a CNC machine and that he had his own FFL. KASPERSON said his business, GCGW, was a separate business and he just rented a spot from RPA.

73. UC#4 asked KASPERSON if KASPERSON could manufacture a firearm. KASPERSON replied, "Yeah I can manufacture," but if he did, he would have to serialize the firearm. KASPERSON told UC#4 when ATF was at the business, he showed them his machine, and told ATF what he intended to use the machine for. KASPERSON stated to UC#4 that he had asked ATF if they had a problem with what he was doing. KASPERSON continued to say that ATF said no, since KASPERSON was a separate entity from RPA.

74. UC#4 walked with KASPERSON into the corner of RPA where KASPERSON claimed to rent a space. UC#4 observed that this area was not separated from RPA by any physical barriers and there was no discernible separation of the two shops (GCGW and RPA).

75. KASPERSON showed UC#4 the machine KASPERSON uses to mill AR-15 blanks into AR-15 lower receivers. KASPERSON said he has an FFL but he doesn't sell guns. KASPERSON said he doesn't sell firearms because it's too confusing. KASPERSON said all he does is "gunsmithing."[15]

76. KASPERSON told UC#4 that it was up to UC#4 if he wanted to purchase a AR-15 lower receiver that was already milled or have an AR-15 blank milled out right then. UC#4 asked KASPERSON how long would it take to mill out his AR-15 blank and KASPERSON replied saying approximately thirty minutes to an hour. UC#4 told KASPERSON he would take the one that was already milled and traded the AR-15 blank for a completed AR-15 lower receiver. Afterwards, KASPERSON and UC#4 walked to

---

[15] A gunsmith is someone who repairs firearms.

30

the cash register area of RPA. KASPERSON told the RPA employee to charge UC#4 $75 for the milling. UC#4 left RPA/GCGW with a completed AR-15 lower receiver.

## N.   July 24, 2013 – Purchase from QUILACIO

77. On July 24, 2013, UC#2 met with QUILACIO to discuss building an AR-10 rifle. QUILACIO said he was not going to use PHILIP but rather was going to get the AR-10 blank from "Luis" (LUIS CORTEZ). QUILACIO further stated that he was going to ask Luis's brother "Jimmy" (EMILIANO CORTEZ) to do the milling. QUILACIO said that he and HAIL were trying to purchase 100 AR-10 blanks from PHILIP just to fill their "pre-orders" for AR-10s. At the conclusion of this meeting, UC#2 paid QUILACIO $2,000 as a down payment for the AR-10 that QUILACIO promised to provide.

78. On July 30, 2013, UC#2 met with QUILACIO to pick up the completed AR-10 rifle that QUILACIO had built. QUILACIO said that "Jimmy" milled the AR-10 blank at LCG. QUILACIO said if he started producing more AR-10s, he would get the blanks from HAIL because they are cheaper. QUILACIO said he went to LCG and gave the blank to "Jimmy" who took the blank and milled it out on site. QUILACIO said he never touched it during the milling process and that he paid "Jimmy" $90. QULACIO said he believed "Jimmy" had used a CNC machine to cut the blank into a firearm.

   a. QUILACIO said he believed LUIS CORTEZ gets his blanks from a different source (than HAIL) and that LUIS CORTEZ had purchased a large bundle of approximately 1,000 AR-15 blanks. QUILACIO said LUIS CORTEZ has only approximately 600 left and had sold, he believed, approximately 400.

   b. QUILACIO said HAIL's website is www.beararmscustoms.com.

   c. Prior to the conclusion of this meeting UC#2 paid QUILACIO the balance of $640 for the AR-10 rifle.

## O.   August 28, 2013 – Purchase from LCG

79. On August 27, 2013, UC#2 and QUILACIO went to LCG. QUILACIO asked if EMILIANO CORTEZ was available. LUIS CORTEZ said that EMILIANO CORTEZ had moved to Fresno and opened his own shop. UC#2 and LUIS CORTEZ discussed purchasing an AR-15. LUIS CORTEZ indicated that he could not mill out an AR-15 blank because EMILIANO CORTEZ had taken the milling machine down to Fresno. LUIS CORTEZ told UC#2 to return the next day.

80. On August 28, 2013, UC#2 returned to LCG.  LUIS CORTEZ informed UC#2 that
UC#2's firearm was in the process of being finished.  UC#2 waited, UC#2 heard
TURNER tell another customer that TURNER owned twelve-or-thirteen AR-15s and
four-or-five pistols.  LUIS CORTEZ eventually returned and provided the AR-15 rifle to
UC#2 in a gun bag.  LUIS CORTEZ provided the firearm to UC#2 disassembled.  UC#2
paid $950 to LUIS CORTEZ.  UC#2 later met with QUILACIO who assembled the
firearm (pictured below) for UC#2.  UC#2 had previously paid $100 to QUILACIO on
August 27, 2013 to compensate him for his time and expertise.



*Photo 16 – AR-15 purchased on August 28, 2013*

## P.    September 17, 2013 – Fremont Location (NORTHERN DISTRICT)

81. On September 17, 2013, ATF conducted an operation where undercover agents
purchased a short-barreled AR-15 rifle built from an AR-15 blank from a shop run by
Valentin CORTEZ-GARCIA ("VALENTIN CORTEZ") at 5680 Boscell Common,
Fremont, California.  ATF UCs spoke with VALENTIN CORTEZ who told the UCs that
he was the owner of the shop.  Additionally, VALENTIN CORTEZ told the UCs that he
was the brother of "Luis" and "Jimmy" (referring to LUIS CORTEZ and EMILIANO
CORTEZ).  Agents in the Northern District are planning to execute a search warrant at
this location in conjunction with the locations discussed in this Affidavit.

82. Subsequent investigation determined that VALENTIN CORTEZ was likely not
manufacturing firearms in his Fremont location but rather selling firearms that were
manufactured by EMILIANO CORTEZ in Fresno, California.

///

///

### Q.      September 23, 2013 – Raptor Magazines – EMILIANO CORTEZ's New Operation in Fresno

83. On September 21, 2013, ATF undercover agents attended the "Crossroads of the West" gun show in Sacramento, California. While at the show, ATF undercover agents were able to identify that LCG had multiple vendor tables set up throughout the show. At one of the LCG tables, an ATF undercover inquired about a business card for Raptor Magazines & AR-15 Supplies that was displayed on the table. The individual working at the table told the ATF undercover agent that Raptor was a business that would mill out AR-15 blanks.

    a. Subsequently, ATF undercover agents were able to determine that EMILIANO CORTEZ was operating Raptor Magazine & AR-15 Supplies in Fresno.

84. On September 23, 2013, ATF UC#3 went to Raptor Magazines & AR-15 Supplies located at 5542 E Kings Canyon Road, Fresno, California (Attachment A-10). UC#3 made contact with EMILIANO CORTEZ. UC#3 told EMILIANO CORTEZ that he wanted to build an AR-15. EMILIANO CORTEZ told UC#3 to pick out an AR-15 blank (from a selection available at the shop). EMILIANO CORTEZ led UC#3 to a separate room where a drill press was located. UC#3 observed that EMILIANO CORTEZ was carrying a .45-caliber pistol on his person and that there was a fully assembled shotgun and AR-15 rifle located in the same room as the drill press.

85. EMILIANO CORTEZ switched on the drill press, positioned the AR-15 blank on the drill press, and then instructed UC#3 on how to operate the drill press to drill three holes into the AR-15 blank. EMILIANO CORTEZ then informed UC#3 that EMILIANO CORTEZ would complete the remaining necessary drilling work. EMILIANO CORTEZ is pictured below operating the drill press.



*Photo 17 - EMILIANO CORTEZ operating a drill press on September 23, 2013*

33

86. While EMILIANO CORTEZ was continuing to work on the AR-15 blank, UC#3 was directed by another Raptor employee to pick out accessories and parts for the firearm that was being created. UC#2 asked the employee how long Raptor had been open. The employee responded that Raptor had been open for approximately four weeks. The employee explained that EMILIANO CORTEZ was working with his brother LUIS CORTEZ who had a shop in Sacramento on Florin Road.

87. After EMILIANO CORTEZ finished converting the AR-15 blank into an AR-15 lower receiver, EMILIANO CORTEZ assembled a complete short-barreled AR-15 rifle using the parts selected by UC#3. Once EMILIANO CORTEZ had finished assembling the AR-15 rifle, he separated the lower receiver from the upper receiver and placed them into a rifle bag and gave the bag to UC#3. The Raptor employee had previously told UC#3 that the rifle needed to be this way so that it was not a fully assembled short-barreled rifle during transportation.

    a. ATF agents subsequently measured the barrel length of this rifle and determined it to be seven inches in length.

88. UC#3 paid $1,180 to EMILIANO CORTEZ and left Raptor with the AR-15 rifle (pictured below).



*Photo 18 - AR-15-style short barrel rifle manufactured by EMILIANO CORTEZ on September 23, 2013*

### R. October 3, 2013 – Controlled Purchase of AR-15 at Raptor Magazines

89. On October 3, 2013, UC#2 and UC#3 visited Raptor Magazines. UC#2 and UC#3 made contact with EMILIANO CORTEZ. UC#2 and UC#3 told EMILIANO CORTEZ that they wanted to make another AR-15. UC#3 selected an AR-15 blank from three choices provided a Raptor employee. The employee then gave the AR-15 blank to EMILIANO CORTEZ. EMILIANO CORTEZ had UC#2 drill three holes into the AR-15 blank and

then EMILIANO CORTEZ milled out the cavity.  EMILIANO CORTEZ then directed UC#3 to drill two more holes.  EMILIANO CORTEZ finished machining the AR-15 lower receiver and assembled the finished AR-15 rifle.  EMILIANO CORTEZ handed the rifle to UC#3 (pictured below).  UC#3 paid $1,815 for the rifle, parts, and labor.



*Photo 19 - AR-15-style rifle manufactured by EMILIANO CORTEZ on October 3, 2013*

## Training and Experience Related to Firearms Trafficking

90. I know from my training, experience, and discussions with other experience law enforcement officials that firearm traffickers and/or manufacturers frequently possess the following evidence of their unlawful activity in their residences, shops, storage units, vehicles and on their persons:

   a. Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, blanks, and barrels,

   b. Information concerning where and from whom the trafficker/manufacturer purchased firearms or firearm parts,

   c. Information concerning where and to whom the trafficker/manufacturer sold firearms or firearm parts,

   d. Firearm records (purchase/sale, method of payment), documents related to milling of the firearms, notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale),

   e. Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase,

35

f.  Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.

g.  Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts,

h.  Written statements showing profits made from the sale of firearms or firearm parts for internal purposes,

i.  Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms,

j.  Cell phone records which show the phone number and subscriber information, and numbers called/received,

k.  Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

l.  Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws,

m.  Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

91. I know from my training and experience and discussions with experience law enforcement officers, that individuals that own firearms store the firearms in safes, gun safes, locked cabinets, and/or other secured containers. I also know that individuals that possess firearms typically store their firearms in their homes. They store their firearms in their homes for a number of reasons, including, to safely and securely store the firearm, for quick access to the firearm for personal and property protection, and for convenient access for use of firearms for sporting purposes.

92. I know that firearm traffickers and/or manufacturers, as well as criminal co-conspirators generally, use cellular telephones to communicate with one another, either by voice or text message. Cellular telephones are digital devices that preserve in their memory a

36

history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearm traffickers and/or manufacturers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Cellular telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by firearm traffickers and/or manufacturers is evidence of the associations of the firearm traffickers and/or manufacturers, some of which are related to his or her illegal business. Cellular telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearm trafficker's and/or manufacturer's mobile telephone can contain evidence of firearm trafficking and/or manufacturing because it shows the communications or planned communications of a firearm trafficker and/or manufacturer and the telephone numbers of those with whom the firearm trafficker and/or manufacturer communicated or intended to communicate. Cellular telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers and/or manufacturers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Cellular telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by firearm traffickers and/or manufacturers. Cellular telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

    a. It has been my experience in the past, and particularly in this case, that when suspects utilize cellular telephones to communicate with cooperating individuals or undercover agents to set up the purchase of guns, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the firearm traffickers and/or manufacturers in this case, QUILACIO, PHILIP and HAIL, have used in the course of this investigation; text messaging to communicate about their ongoing trafficking and/or manufacturing in firearms. Based on my training and experience, I believe that LUIS CORTEZ, TURNER, MASON, EMILIANO CORTEZ, KASPERSON, and CROWNINSHIELD have likely communicated via text messaging with each other and/or other potential buyers of firearms.

93. In my experience, firearm traffickers and/or manufacturers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

94. Repeated firearm trafficking and/or manufacturing activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearm traffickers and/or manufacturers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

95. As a result of my experience and training, I have learned that firearm traffickers and/or manufacturers maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices. It is also my experience that these traffickers and/or manufacturers tend to keep these accounts and records in their residence and in the areas under their control. Through my training and experience, I know that the business of firearms trafficking and/or manufacturing is similar to drug trafficking and by analogy in the case of drug dealers, evidence is likely to be found where the dealers live. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

96. Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm trafficker's and/or manufacturer's person to secure this evidence.

97. I know, based on my training and experience, that the number of firearm traffickers and/or manufacturers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearm traffickers and/or manufacturers and distributors convenient devices for recording information concerning firearms, including

38

sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearm traffickers and/or manufacturers and distributor. Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearm traffickers and/or manufacturers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearm traffickers and/or manufacturers, these communication devices are part of their normal business equipment.

98. I also know from my training, experience and from discussions with other law enforcement officials that persons with an FFL (which licenses them to sell or manufacture firearms to the public), who engage in unlawful firearm sales frequently have the below-described materials in addition to the above-described material, which is frequently evidence needed to prove the unlawful activity:

    a. Records concerning firearm manufacturing, purchases, and sales including, but not limited to, the dealers' "Firearms Receipt and Disposition" book which is required by federal regulations to be kept by persons with an FFL, ATF Forms 4473 (required for each firearm sale), inventory tracking documents, shipping boxes and labels, correspondence with the firearms suppliers or firearms purchasers, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.

    b. Records showing private party transfers conducted by the FFL.

    c. Photographs of firearms or firearm parts purchased or sold.

    d. Indicia of persons in control of, and working at, the premises.

    e. The above-described documentary evidence may be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, lap-tops or other digital storage device.

99. As described above, this Affidavit seeks permission to search and seize things that are related to the ongoing conspiracy between QUILACIO, PHILIP, HAIL, LUIS CORTEZ, TURNER, MASON, EMILIANO CORTEZ, KASPERSON, and CROWNINSHIELD in whatever form such things are stored. Accordingly, based on the investigation in this

case and my training and experience, I believe that items listed in Attachment B will be found on the persons and in the vehicles and locations listed in Attachments A-1 – A-11.

    a. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. Accordingly, the digital evidence, to include, but not limited to, computers, cellular telephones, digital devices, and electronic storage media, seized pursuant to this search warrant will be handled according to the protocol set out in Attachment C.

## Explanation of Conspiracy to Manufacture and Deal in Firearms

100. Based on the facts presented in this Affidavit, my training and experience, and information from other law enforcement officers involved in this investigation, it is my belief that all the parties in this conspiracy are working together for the purpose of manufacturing and selling firearms. These individuals are using the pretext of customer participation and starting with AR-15 blanks to cover up the fact that they are manufacturing and selling unregistered, unserialized, and unaccountable firearms for profit.

101. A customer, in a matter of a few hours or a single day, can walk into a store with cash and leave with a functioning AR-15 rifle, or similar style firearm, without abiding by any of the regulations or the requirements established by ATF and/or the state of California when purchasing a retail firearm.

102. The following steps outline the process of how a customer can obtain a fully functioning firearm by interacting with members of the conspiracy, who are manufacturing firearms from AR-15 blanks:

    a. A customer will first obtain an AR-15 blank from a local gun and/or gun parts store.

    b. The customer will then be referred by that gun and/or gun parts store to a machine shop or a machinist in order to have the AR-15 blank milled into complete AR-15 lower receiver.

      c.  The customer will then return to the gun and/or gun parts store to obtain the parts and accessories to assemble a complete AR-15 style firearm.

103.     In summary, the subjects of this investigation are devoting time and effort in the repetitive sale of firearms for the explicit purpose of making a profit.

## Summary of Evidence Related to Search Locations

104.     LCG AR Parts and Custom Accessories, a business located at 8524 Florin Road, Sacramento, California, as further described in Attachment A-1.

      a.  On April 3, 2013, UC#1 purchased an AR-15 pistol from LCG.  The AR-15 pistol was manufactured from an AR-15 blank in the machine shop at LCG.  UC#1 observed firearms displayed throughout the shop.

      b.  On April 17, 2013, CI#1 and UC#1 purchased AR-15 firearms from LCG.

      c.  On August 8, 2013, I queried Accurint and determined that this business is associated with EMILIANO CORTEZ.

          i.  Accurint is a comprehensive database of public records (e.g. motor vehicle records, business records, and real property records) maintained by LexisNexis.  Accurint is used by law enforcement to verify names and addresses.  I have used Accurint in past investigations and found it to be accurate.

      d.  On August 27, 2013, UC#2 purchased an AR-15 rifle from LCG.

      e.  On October 2, 2013, UC#2 called LCG and spoke to LUIS CORTEZ.  LUIS CORTEZ confirmed that the shop was open and available to conduct work on AR-15 blanks.

105.     2004 Michigan Boulevard, West Sacramento, California (residence of LUIS CORTEZ), as further described in Attachment A-2.

      a.  On April 17, 2013, CI#1 purchased an AR-15 from LUIS CORTEZ at LCG. LUIS CORTEZ gave CI#1 a business card for LCG.  The phone number on the business card was 916-601-4544.  According to Sprint, the service provider for telephone number 916-601-4544, the subscriber for that cellular telephone number is "Luis Cortes-Garcia 2004 Michigan Blvd West Sacramento, CA

95691." As of September 24, 2013, the account was still active and associated with this address.

b. According Department of Homeland Security, LUIS CORTEZ is a Mexican national that is illegally present in the United States.

    i. Under 18 U.S.C. § 922(g)(5), an alien who is illegally or unlawfully in the United States is prohibited from possessing a firearm that has been shipped or transported in interstate commerce.

c. On August 8, 2013, I queried Accurint and determined that this residence is associated with LUIS CORTEZ.

d. On September 20, 2013, at 9:30 p.m. UC#3 observed a 2000 GMC van used by LUIS CORTEZ, and bearing a logo for LCG, parked at 2004 Michigan Boulevard.

e. Also on September 20, 2013, UC#3 observed the 2009 Cadillac Escalade ESV (6SZV861) and a trailer (4LG4175) attached to the Escalade parked at 2004 Michigan Boulevard. The 2009 Escalade is registered in the name of LUIS CORTEZ's wife at 2004 Michigan Boulevard.

106.    3541 Sun Maiden Way, Antelope, California (residence of Michael TURNER), as further described in Attachment A-3.

a. On August 8, 2013, I queried Accurint and determined that this residence is associated with TURNER.

b. On August 28, 2013, UC#2 overheard TURNER tell another customer at LCG that TURNER had twelve or thirteen AR-15s and four or five pistols.

c. On October 2, 2013, an ATF task force officer observed TURNER arrive at 3541 Sun Maiden Way and enter the residence. TURNER was driving a 2012 Hyundai Veloster registered to TURNER at the Sun Maiden Way address.

d. According to the California Department of Motor Vehicles, as of October 5, 2013, TURNER's current address is "3541 Sun Maiden Way, Antelope 95843."

107.    C&G Tool Inc., a business located at 910 Striker Avenue, Suite B, Sacramento, California, as further described in Attachment A-4.

42

a.  On April 3, 2013, TURNER told UC#1 that TURNER had gone to C&G to convert an AR-15 blank into an AR-15 lower receiver.  At this same time, TURNER referred a LCG customer to C&G to convert an AR-15 blank into an AR-15 lower receiver.

b.  On April 17, 2013, a customer at LCG informed UC#1 that the customer had milled his AR-15 blank into an AR-15 lower receiver at C&G.

c.  On May 3, 2013, UC#1 conducted a controlled purchase at this location.  A CNC machine at this location was used to convert two AR-15 blanks and an AR-10 blank into a complete AR lower receivers.

d.  On August 8, 2013, I queried Accurint and determined that this business is associated with Daniel CROWNINSHIELD.

e.  On October 2, 2013, UC#2 called C&G's main business line and determined that the business was open and operating.

108.    DW Machine Inc., a business located at 950 Riverside Parkway, Suite 70, West Sacramento, California, as further described in Attachment A-5.

a.  Employees at LCG referred customers to DW Machine and PHILIP for milling AR-15 blanks.

b.  On May 31, 2013, QUILACIO went to DW Machine, believed to be for the purpose of milling ten AR-15 blanks in AR-15 lower receivers ordered by UC#2. QUILACIO had previously discussed milling twenty AR-15 blanks with PHILIP.

c.  On June 28, 2013, QUILACIO went to DW Machine, believed to be for the purpose of milling four AR-15 blanks in AR-15 lower receivers ordered by UC#2. On July 2, 2013, QUILACIO told UC#2 that he had milled the AR-15 blanks at DW Machine with co-owner Dean Wilson.

d.  On August 8, 2013, I queried Accurint and determined that this business is associated with Dean Wilson.

e.  On September 24, 2013, UC#3 conducted surveillance at DW Machine and observed the front door to the business was open.

     f.  On October 2, 2013, UC#2 called DW Machine's main business line, an automated answering machine stated the name of the business but did not indicate the days or hours of operation.

109.     23526 Rosewood Road, Auburn, California (residence and business location of Craig MASON), as further described in Attachment A-6.

     a.  On April 25, 2013, CI#1 went to this residence to have two AR-15 blanks machined into AR-15 lower receivers by MASON.

     b.  On August 8, 2013, I queried Accurint and determined that this residence is associated with Craig MASON.

     c.  According to the California Department of Motor Vehicles, as of October 6, 2013, MASON's 2002 GMC pickup truck is registered to "Craig Steven Mason 23526 Rosewood Rd, Auburn."

110.     1900 Danbrook Drive, Unit #1611, Sacramento, California (residence of Ronald QUILACIO), as further described in Attachment A-7.

     a.  On August 8, 2013, I queried Accurint and determined that this residence is associated with Ronald QUILACIO.

     b.  On May 6, 2013, an ATF UC conducted a controlled purchase where QUILACIO brought the UC to his residence to build the firearms. During this transaction and while inside QUILACIO's house, QUILACIO assembled a short-barreled rifle for UC#2. While assembling the firearm for UC#2, QUILACIO could not get one of the parts provided by UC#2 to fit properly. QUILACIO exchanged one of the parts provided by UC#2 with a firearm part that QUILACIO had in his residence.

     c.  QUILACIO told UC#2 on various occasions about an on-going firearms trafficking business that QUILACIO was conducting with HAIL. During the course of this investigation, law enforcement has not observed QUILACIO to utilize a business address. QUILACIO conducted all of his firearms transactions with UC#2 either at QUILACIO's Danbrook residence or in public parking lots.

     d.  On October 2, 2013, UC#2 contacted QUILACIO via text message in order to confirm if QUILACIO still lived at 1900 Danbrook. During the course of the text message exchange, QUILACIO confirmed that he continued to reside at the Danbrook residence.

111.     Rendezvous Primitive Arms, a business located at 28 W. Main Street, Ione, California, as further described in Attachment A-8.

    a.  On July 10, 2013, UC#4 conducted a controlled purchase of a completed AR-15 lower receiver from this business.

    b.  On August 8, 2013, I queried the FFL of KASPERSON, which revealed the listed address of the license to be "28 West Main Street, Ione, California."

    c.  On October 2, 2013, UC#2 called RPA and spoke to a RPA employee. The employee confirmed that RPA was open and available to mill AR-15 blanks.

    d.  KASPERSON's FFL number is 968005076E03610.

    e.  RPA's FFL number is 968005015H02246.

112.     1240 Stags Leap Road, Placerville, California 95667 (residence of Bradley HAIL), as further described in Attachment A-9.

    a.  HAIL operates an online business called Beararms Customs. The website for this business does not list a business address. During the course of this investigation, law enforcement has not identified a business address used by HAIL.

        i.  The facebook page for Beararms Customs lists the location as "Placerville, California 95667."

        ii.  Based on my training and experience and discussions with other law enforcement agents, I know that when an online business is not associated with a business address on its business website, that business is often operated via mail order or out of the individual's residence.

    b.  On May 28, 2013, HAIL arrived to a meeting with UC#2 and QUILACIO driving a Jeep Wrangler with California license plate 6LUY051. According to the California Department of Motor Vehicles, this vehicle is registered to HAIL at 1240 Stags Leap Road, Placerville 95667." At this meeting, HAIL took possession of twenty AR-15 blanks that were subsequently converted into AR-15 rifles and sold to UC#2. Fifteen of these firearms were short-barreled. HAIL transported these AR-15 blanks in his Jeep Wrangler.

c. On August 8, 2013, I queried Accurint and determined that 1240 Stags Leap Road, Placerville, California 95667 is associated with Bradley HAIL.

d. On October 3, 2013, the below photograph was posted on Beararms Customs facebook page under the caption "Got lowers?"



*Photo 20 - Photograph of at least thirty blanks from the Beararms Customs facebook page*

e. On October 4, 2013, the below photograph was posted on the Beararms Customs facebook page under the caption "Lowers getting machined in the Cnc machine."



*Photo 21 - Photograph of CNC machine from Beararms Customs facebook page*

46

     f.  According to the California Department of Motor Vehicles, as of October 5, 2013, HAIL's current address is "1240 Stags Leap Road, Placerville 95667."

     g.  On October 5, 2013, law enforcement conducted surveillance at 1240 Stags Leap Road. Law enforcement agents observed HAIL's wife in the front yard of the residence. Law enforcement also observed HAIL's Jeep Wrangler and a green 2004 GMC Yukon XL. According to the California Department of Motor Vehicles, HAIL has a 2004 GMC Yukon XL bearing California license plate 6PWS251 registered to HAIL at 1240 Stags Leap Road.

113.     5542 E. Kings Canyon Road, Fresno, California (business location of Raptor Magazines & AR-15 Supplies), as further described in Attachment A-10.

     a.  On October 3, 2013, UC#3 conducted a controlled purchase of an AR-15 rifle at this business address. At this location, EMILIANO CORTEZ used various tools including a drill press to manufacture the AR-15 rifle purchased by UC#3.

114.     1515 N. Willow Avenue, Fresno, California (residence of EMILIANO CORTEZ), as further described in Attachment A-11.

     a.  September 23, 2013, ATF agents followed EMILIANO CORTEZ from Raptor Magazines to the Willow Avenue residence. EMILIANO CORTEZ was driving a 2011 Chevrolet Suburban (California license plate 6LFB940).

         i.  The 2011 Suburban is registered to Jose Ernesto Raminez at 3729 Savannah Rd, Fremont, CA.

     b.  On October 2, 2013, an ATF undercover agent observed the same 2011 Suburban (California license plate 6LFB940) and 2013 trailer (California license plate 4MH7488) parked at 1515 N. Willow Avenue.

         i.  The trailer bearing license plate 4MH7488 is registered to Marcela Lucero Mejia at 1515 N. Willow Ave, Fresno, CA.

115.     Vehicles and conveyances believed to used to facilitate the unlawful trafficking and manufacturing of firearms and transportation of illegal firearms:

     a.  Gray 2012 trailer with California license plate number 4MR1919, registered to "LCG AR Parts" at 8524 Florin Road, Sacramento, California.

b. 2011 trailer with California license plate number 4LX6676, registered to "Valentin Garcia" at 8524 Florin Road, Sacramento, California.

c. 2011 trailer with California license plate number 4LU4246, registered to "Legar Parts" at 8524 Florin Road, Sacramento, California.

d. White 2000 GMC Van with California license plate number 8U86972, registered to "Robert Gutierrez" or "Raymundo Acevedo Cortez" at 8524 Florin Road, Sacramento, California.

e. Black 2009 Cadillac Escalade ESV with California license plate 6SZV861, registered to Gabriela Perez Marin, 2004 Michigan Boulevard, West Sacramento, California.

   i. On October 6, 2013, this vehicle was observed at 2004 Michigan Boulevard.

f. 2011 trailer with California license plate 4LG4175, registered to "Janet Hand," 5877 Power Inn Road, Sacramento, California.

g. 2003 Ford Excusion XLT with California license plate 5CWJ033, registered to "Valentin C. Garcia" at 2004 Michigan Boulevard, West Sacramento, California.

h. Red 2012 Hyundai Veloster with California license plate number 4722SDP, registered to "Michael R. Turner" at 3541 Sun Maiden Way, Antelope, California.

   i. TURNER's vehicle contains the disabled person placard number H507654; VIN: 041972TUR, registered to "Michael Robert Turner" at 3541 Sun Maiden Way, Antelope, California.

i. White 2002 GMC Sierra K1500 with California license plate number FAST5OS, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

j. 2012 Trailer, California license plate number 4LN3241, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

48

k.  Gray 1992 Toyota truck w/ shell cover, California license plate number 6J80501, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

l.  Gray 2013 Subaru Impreza WRX with license plate number 6ZLC403, registered to "Ronald Quilacio" at 1900 Danbrook Drive, Unit #1611, Sacramento, California.

   i.  On June 10, 2013, QUILACIO drove the above-noted Subaru to a meeting with UC#2.  QUILACIO used the vehicle to transport five short-barreled AR-15 rifles that he subsequently delivered to UC#2.

m.  Red 2010 Nissan Versa with California license plate number 6KHP715, registered to "Marilyn Meth" or "Kelly A. Maroney" at 7861 Ivy Hill Way, Antelope, California.

   i.  On June 5, 2013, QUILACIO drove the above-noted Nissan to a meeting with UC#2.  QUILACIO used the vehicle to transport five short-barreled AR-15 rifles that he subsequently delivered to UC#2.

n.  Black 2010 Jeep Wrangler Unlimited Sport with California license plate number 6LUY051, registered to "Kasey Hail" or "Bradley Hail" at 1240 Stags Leap Road, Placerville, California.

   i.  On May 28, 2013, Bradley HAIL met with QUILACIO and UC#2 to discuss a firearms transaction.  HAIL arrived at the meeting driving the above-noted Jeep.  At the meeting HAIL took possession of twenty AR-15 blanks and transported them in his Jeep.  These fifteen of these twenty AR-15 blanks were subsequently converted into short-barreled AR-15 rifles.

o.  Blue 2001 Chevrolet Suburban, California license plate 6LFB940, registered to Jose Ernesto Ramirez, 3729 Savannah Road, Fremont, California.

   i.  This vehicle was observed being driven by EMILIANO CORTEZ to his Fresno residence on September 23, 2013.

p.  2013 Trailer, California license plate 4MH7488, registered to Marcela Lucero Mejia, 1515 N. Willow Avenue, Fresno, California.

## Request to Seal

116.     This criminal investigation is ongoing.  ATF contemplates a number of additional interviews, subpoenas, and possibly grand jury testimony of witnesses in the near future. Disclosure of the contents of this Affidavit at this time could seriously impede the continuing investigation and potential prosecution by prematurely disclosing the details of the United States's investigation.  This could potentially cause subjects of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case.  Also, potential interviewees would be able to identify specific subjects of the investigation and could fabricate responses in order to avoid possible criminal liability.  Accordingly, I respectfully request that the Court issue an order sealing this search warrant application and Affidavit until further order of this Court, with the exception that copies of the search warrant will be left at the scene of each search location and copies will be used by law enforcement as part of the execution of these search warrants and the continuing investigation.

///

///

///

///

///

///

///

///

///

///

///

///

## Conclusion

117.     Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (unlawful dealing in firearms); 18 U.S.C. § 922(d) (unlawful sale of firearm or ammunition to prohibited person); 18 U.S.C. § 922(g) (unlawful possession of a firearm by a prohibited person); 26 U.S.C. § 5861(f) (unlawful manufacturing of a firearm); 26 U.S.C. § 5861(i) (possession of an unserialized firearm); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses) are concealed in the locations identified in Attachment A-1 through A-11.  Accordingly, I respectfully request the issuance of search warrants authorizing the search of the locations described in Attachments A-1 through A-11 and the seizure of the items described in Attachment B.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

_____
JERRY DONN
ATF Special Agent


Sworn and Subscribed to me on October 7, 2013,

_____
Hon. CAROLYN K. DELANEY
United States Magistrate Judge

Approved as to form:

_____
JUSTIN L. LEE
Assistant United States Attorney

51

## ATTACHMENT A-1

### *Description of the Location to be Searched*

LCG AR Parts and Custom Accessories, a business located at 8524 Florin Road, Sacramento, California.



LCG is co-located with "Garcia's Plastering Equipment" in the premise of 8524 Florin Road, Sacramento, California. The premise consists of a one-story stand-alone building. The building, located on the south side of Florin Road, is painted brown on the north side with the main entrance facing Florin Rd. The east side of the building is painted off-white. The area to the east of the building is fenced off with a black iron-wrought fence with razor wire affixed to the top. The front windows are protected by security bars. A banner displaying "LCG AR Parts and Custom Accessories" is displayed outside the premise.

The authority to search this location includes:

1. The persons of:

    a. Luis CORTEZ-GARCIA.

    b. Emiliano CORTEZ-GARCIA aka "Jimmy.

    c. Michael TURNER.

2. Gray 2012 trailer with California license plate number 4MR1919, registered to "LCG AR Parts" at 8524 Florin Road, Sacramento, California.

3. 2011 trailer with California license plate number 4LX6676, registered to "Valentin Garcia" at 8524 Florin Road, Sacramento, California.

4.  2011 trailer with California license plate number 4LU4246, registered to "Legar Parts" at 8524 Florin Road, Sacramento, California.

5.  White 2000 GMC Van with California license plate number 8U86972, registered to "Robert Gutierrez" or "Raymundo Acevedo Cortez" at 8524 Florin Road, Sacramento, California.

6.  Black 2009 Cadillac Escalade ESV with California license plate 6SZV861, registered to Gabriela Perez Marin, 2004 Michigan Boulevard, West Sacramento, California.

7.  On October 6, 2013, this vehicle was observed at 2004 Michigan Boulevard.

8.  2011 trailer with California license plate 4LG4175, registered to "Janet Hand," 5877 Power Inn Road, Sacramento, California.

9.  2003 Ford Excusion XLT with California license plate 5CWJ033, registered to "Valentin C. Garcia" at 2004 Michigan Boulevard, West Sacramento, California.

10. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT A-2

### *Description of the Location to be Searched*

2004 Michigan Boulevard, West Sacramento, California



2004 Michigan Boulevard, West Sacramento, California consists of a one-story residence with a black iron-wrought fence in the front of the premises on Michigan Boulevard. The residence, located on the north side of Michigan Boulevard, has cream colored walls with the roof and trims painted brown. The number "2004" is affixed to the beams near the front entrance. The front door to the residence is secured with a white metal security screen door.

The authority to search this location includes:

1. The persons of:

    a. Luis CORTEZ-GARCIA.

    b. Emiliano CORTEZ-GARCIA aka "Jimmy.

2. Gray 2012 trailer with California license plate number 4MR1919, registered to "LCG AR Parts" at 8524 Florin Road, Sacramento, California.

3. 2011 trailer with California license plate number 4LX6676, registered to "Valentin Garcia" at 8524 Florin Road, Sacramento, California.

4. 2011 trailer with California license plate number 4LU4246, registered to "Legar Parts" at 8524 Florin Road, Sacramento, California.

5. White 2000 GMC Van with California license plate number 8U86972, registered to "Robert Gutierrez" or "Raymundo Acevedo Cortez" at 8524 Florin Road, Sacramento, California.

6. Black 2009 Cadillac Escalade ESV with California license plate 6SZV861, registered to Gabriela Perez Marin, 2004 Michigan Boulevard, West Sacramento, California.

7. On October 6, 2013, this vehicle was observed at 2004 Michigan Boulevard.

8. 2011 trailer with California license plate 4LG4175, registered to "Janet Hand," 5877 Power Inn Road, Sacramento, California.

9. 2003 Ford Excusion XLT with California license plate 5CWJ033, registered to "Valentin C. Garcia" at 2004 Michigan Boulevard, West Sacramento, California.

10. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

## ATTACHMENT A-3

### *Description of the Location to be Searched*

3541 Sun Maiden Way, Antelope, California.



3541 Sun Maiden Way, Antelope, California consists of a one-story residence with an attached two car garage. The residence, located on the west side of Sun Maiden Way, has cream colored walls with the trim painted green. The number "3541" is affixed to the wall by the garage door facing Sun Maiden Way.

The authority to search this location includes:

1.  The person of:

    a. Michael TURNER.

2.  A Red 2012 Hyundai Veloster with California license plate number 4722SDP, registered to "Michael R. Turner" at 3541 Sun Maiden Way, Antelope, California.

3.  Any vehicle that bears the disabled person placard number H507654; VIN: 041972TUR, registered to "Michael R. Turner" at 3541 Sun Maiden Way, Antelope, California.

4.  The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage

devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises.  Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT A-4

### *Description of the Location to be Searched*

C&G Tool Inc., a business located at 910 Striker Avenue, Suite B, Sacramento, California.



"C&G Tool Inc." consists of a one-story multi-business building. The building, located on the south side of Striker Avenue, is painted grey and white and the number "910" is affixed to the north corner of the building. On the main entrance door, facing west towards the parking lot, "B" is affixed in white on the glass, as well as "C&G Tool Inc." on the adjacent glass in white. The business also has a garage entrance to the rear of the building.

The authority to search this location includes:

1. The person of:

   a. Daniel CROWNINSHIELD.

2. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession

and control of the premises.  Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT A-5

### *Description of the Location to be Searched*

DW Machine Inc., a business located at 950 Riverside Parkway, Suite 70, West Sacramento, California.



"DW Machine Inc." consists of a one-story multi-business building, located on the west side of Riverside Parkway. The building is painted white and the number "950" is affixed to the north corner of the building. Above the front entrance facing Riverside Parkway "Suite 70" is affixed in white on the glass. The business also has a garage entrance to the rear of the building.

The authority to search this location includes:

1. The person of:

    a. Stephen PHILIP.

2. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession

and control of the premises.  Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

## ATTACHMENT A-6

### *Description of the Location to be Searched*

23526 Rosewood Road, Auburn, California.





23526 Rosewood Road, Auburn, California, located on the north side of Rosewood Road, consists of two separate two-story buildings on the premise.

    a.   Two-story, warehouse style building that is painted tan in color with green trim. Has a single car, garage-door style access.

Attachment A

b. Two-story, residential style building with two attached single car garages that is painted tan in color with green trim.

The premise is surrounded with a black iron-wrought fence. The main entrance facing Rosewood Road consists of an automatic gate attached to stone pillars. A sign with the number "23526" is placed by the main gated entrance. A "private property" sign is also placed near the main entrance.

The authority to search this location includes:

1. The person of:

   a. Craig MASON.

2. A White 2002 GMC Sierra K1500 with California license plate number FAST5OS, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

3. A 2012 Trailer, California license plate number 4LN3241, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

4. A Gray 1992 Toyota truck w/ shell cover, California license plate number 6J80501, registered to "Craig Steven Mason" at 23526 Rosewood Road, Auburn, California.

5. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

## ATTACHMENT A-7

### *Description of the Location to be Searched*

1900 Danbrook Drive, Unit #1611, Sacramento, California.



1900 Danbrook Drive, Unit #1611, Sacramento, California, is located on the west side of Danbrook Drive in a subdivision of multiple two-story apartment buildings that are painted tan in color. The subject's residence is in the north-east corner of complex that has a "16| 1611-1628" affixed to the wall of the building. The front door is located on the east side, first floor of the building and the number "1611" is affixed next to the door. The garage has the number "6" affixed to the top of the entrance.

The authority to search this location includes:

1. The person of:

    a. Ronald QUILACIO.

2. A Gray 2013 Subaru Impreza WRX with California license plate number 6ZLC403, registered to "Ronald Quilacio" at 1900 Danbrook Drive, Unit #1611, Sacramento, California.

3. A Red 2010 Nissan Versa with California license plate number 6KHP715, registered to "Marilyn Meth" or "Kelly A. Maroney" at 7861 Ivy Hill Way, Antelope, California.

4. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT A-8

## *Description of the Location to be Searched*

Rendezvous Primitive Arms, a business located at 28 W. Main Street, Ione, California.



Michael Allen KASPERSON's (FFL No.: 968005076E03610) machine shop (co-located in the premise) and "Rendezvous Primitive Arms" (FFL No.: 968005015H02246) at 28 W. Main Street, Ione, California, located on the south side of W Main Street, consists of a one-story multi-business building. The business is at the end of a line of businesses by the intersection of W. Main Street and South Buena Vista Street, with tan painted walls and brown trim. The numbers "28" is affixed above the entrance facing W Main St.

The authority to search this location includes:

1. The person of:

    a. Michael Allen KASPERSON.

2. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession

Attachment A

and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT A-9

### *Description of the Location to be Searched*

1240 Stags Leap Road, Placerville, California.



1240 Stags Leap Road, Placerville, California consists of a one-story residence with an attached two-car garage.  The residence, located on the north side of Stags Leap Road, has tan painted walls with the trim painted white.

The authority to search this location includes:

1.  The person of:

    a.  Bradley HAIL.

2.  Black 2010 Jeep Wrangler Unlimited Sport with California license plate number 6LUY051, registered to "Kasey HAIL" or "Bradley HAIL" at 1240 Stags Leap Road, Placerville, California.

3.  The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession

Attachment A

and control of the premises.  Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

## ATTACHMENT A-10

### *Description of the Location to be Searched*

Raptor Magazines and AR-15 Supplies, a business located at 5542 E. Kings Canyon Road, Fresno, California



"Raptor Magazines & AR-15 Supplies" is located at 5542 E Kings Canyon Road, Fresno, California. The premise consists of a one-story, multi-business building. The building is located on the south side of E Kings Canyon Road. The main entrance faces the parking lot to the west. The building is painted off-white. The banner "Raptor Magazines & AR-15 Supplies" is displayed outside the premises.

The authority to search this location includes:

1. The person of:

    a. Emiliano CORTEZ-GARCIA aka "Jimmy." *J.D. am 10/07/13*

2. Blue 2001 Chevrolet Suburban, California license plate 6LFB940, registered to Jose Ernesto Ramirez, 3729 Savannah Road, Fremont, California.

3. 2013 Trailer, California license plate 4MH7488, registered to Marcela Lucero Mejia, 1515 N. Willow Avenue, Fresno, California.

4. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

## ATTACHMENT A-11

### *Description of the Location to be Searched*

1515 N. Willow Avenue, Fresno, California



1515 N. Willow Avenue, Fresno, California consists of a one-story residence with an attached two car garage. The residence, located on the west side of N. Willow Avenue, has white colored walls with the trim painted green. The number "1515" is painted on the curb adjacent to the driveway facing N Willow Avenue.

The authority to search this location includes:

1.  The person of:

    a.  Emiliano CORTEZ-GARCIA aka "Jimmy."

2.  Blue 2001 Chevrolet Suburban, California license plate 6LFB940, registered to Jose Ernesto Ramirez, 3729 Savannah Road, Fremont, California.

3.  2013 Trailer, California license plate 4MH7488, registered to Marcela Lucero Mejia, 1515 N. Willow Avenue, Fresno, California.

4.  The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage

Attachment A

devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

Attachment A

# ATTACHMENT B

### *List of Items to be Seized*

The following items constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (unlawful dealing in firearms); 18 U.S.C. § 922(d) (unlawful sale of firearm or ammunition to prohibited person); 18 U.S.C. § 922(g) (unlawful possession of a firearm by a prohibited person); 26 U.S.C. § 5861(f) (unlawful manufacturing of a firearm); 26 U.S.C. § 5861(i) (possession of an unserialized firearm); and 18 U.S.C. § 371 (conspiracy to commit the foregoing offenses).

1.  Any firearm that does not have a lawful manufacturer stamp and serial number, any firearm or ammunition not legally possessed under 18 U.S.C. § 922(g) (e.g. the possessor is an illegal immigrant or felon), any unregistered firearm (where registration is required by Title 26 of the United States Code), and blanks of any kind (including AR-15 blanks).

2.  Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

3.  Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

4.  Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

5.  Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.

6.  Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators.

7.  Digital evidence of items described in Attachment B, including items listed in Attachment C.

Attachment B

**8.**      Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing.

**9.**      United States currency in excess of $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or manufacturing of illegal firearms.

**10.**     Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

**11.**     Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

**12.**     Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachments A-1 – A-11.  Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

**13.**     Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 – A-11 without revealing the officer's true identities.

**14.**     Any vehicles and mobile conveyances used and/or associated with unlawful trafficking and manufacturing of firearms, including transporting of any such firearms, firearm parts, or blanks.

**15.**     Any computer numerical control ("CNC")[16] machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-15 blanks (and firearm blanks of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

**16.**     The contents of any surveillance camera or surveillance system used at any of the business locations identified in Attachments A-1, A-4, A-5, A-8, and A-10.

---

[16] A machine utilizing a type of programmable automation, directed by mathematical data, which uses microcomputers to carry out various machining operations.

Attachment B

## ATTACHMENT C

### *Computer and Electronic Evidence Protocol*

Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers, cellular telephones, digital devices, and electronic storage media as described in this attachment at the locations described with particularity in Attachment A-1 – A-11.

This Affidavit seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes. In preparing this Affidavit, I have consulted with experienced law enforcement agents who have received extensive training in the forensic examination of computers and digital devices. These agents related some of the technical information detailed below.

1. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems, and storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

2. Based upon my training and experience, and the investigation to date, I believe that computers, digital devices, and digital records and evidence will be found at locations identified in Attachment A-1 through A-11.

3. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for individuals and businesses to utilize computers to conduct their legal and/or illegal business and to store information related thereto. I know based on my training and experience, including prior investigations specifically related to the trafficking of firearms, that subjects who are engaged in this illegal activity commonly store information related to their activities on computers and digital devices.

**REMOVAL OF DATA STORAGE DEVICES FOR REVIEW
IN A LABORATORY SETTING MAY BE REQUIRED**

4. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

   a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

   b. Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

   c. The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing five hundred gigabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

   d. Because digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial

Attachment C

amount of time to extract and sort through data that is concealed or encrypted to
determine whether it is evidence, contraband, or an instrumentality of a crime.

e.  Analyzing the contents of a computer or other electronic storage device, even
without significant technical difficulties, can be very challenging, and a variety of
search and analytical methods must be used. For example, searching by
keywords, which is a limited text based search, often yields thousands of hits,
each of which must be reviewed in its context by the examiner to determine
whether the data is within the scope of the warrant. Merely finding a relevant hit
does not end the review process. The computer may have stored information
about the data at issue which may not be searchable text, such as: who created it;
when and how it was created, downloaded, or copied; when it was last accessed;
when it was last modified; when it was last printed; and when it was deleted. The
relevance of this kind of data is often contextual. Furthermore, many common
email, database, and spreadsheet applications do not store data as searchable text,
thereby necessitating additional search procedures. To determine who created,
modified, copied, downloaded, transferred, communicated about, deleted, or
printed data requires a search of events that occurred on the computer in the time
periods surrounding activity regarding the relevant data. Information about which
users logged in, whether users shared passwords, whether a computer was
connected to other computers or networks, and whether the users accessed or used
other programs or services in the relevant time period, can help determine who
was sitting at the keyboard.

f.  Searching digital devices can require the use of precise, scientific procedures
designed to recover latent data. The recovery of such data may require the use of
special software and procedures. Data that represents electronic files or remnants
of such files can be recovered months or even years after it has been downloaded
onto a hard drive, deleted, or viewed via the Internet. Even when such files have
been deleted, data can be recovered months or years later using readily available
forensic tools. Normally, when a person deletes a file on a computer, the data
contained in the file does not actually disappear; rather, that data remains on the
hard drive until it is overwritten by new data. Therefore, deleted files, or
remnants of deleted files, may reside in space on the hard drive or other storage
media that is not allocated to an active file. In addition, a computer's operating
system may keep a record of deleted data in a swap or recovery file or in a
program specifically designed to restore the computer's settings in the event of a
system failure.

Attachment C

5. This warrant also seeks authority to seize contextual data (or metadata), that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

    a. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

    b. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

    c. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus

Attachment C

protection, malicious software, evidence of remote control by another computer system, or other programs and/or software that may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## SEARCH PROCEDURE

6.  In searching for data capable of being read, stored, or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel executing the search warrant will employ the following procedure:

    a.  On-site search, if practicable. Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable. Any device searched on-site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachments B and C.

    b.  Seizure of digital devices for off-site imaging and search. If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

    c.  Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B and C.

Attachment C

d. Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

e. If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed one hundred twenty days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original one hundred twenty day period from the date of execution of the warrant. Once it is determined that the device contains evidence of the above-note federal offenses, law enforcement may view and handle the device as law enforcement would any other seized piece of evidence.

f. If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

g. LCG AR Parts and Accessories, C&G Tool Inc., DW Machine Inc., Raptor Magazines & AR-15 Supplies, and Rendezvous Primitive Arms are functioning companies that appear to conduct some legitimate business. The seizure of the company's computers may limit the company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the company so request, the

Attachment C

agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the United States will return it.

## DATA TO BE SEIZED

7. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

    a. Any computer equipment, cellular telephone, digital device, or storage media that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

    b. Any computer equipment, cellular telephone, digital device, or storage media used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

    c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

    d. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, mobile cellular telephone, digital device, or storage media or software.

Attachment C

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, mobile cellular telephone, digital device, or storage media, or data to be searched.

f.  Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, mobile cellular telephone, digital device, storage media, or data.

g.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, mobile cellular telephone, digital device, storage media, or data to be searched.

h.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## RETENTION OF IMAGE

8.  The United States will retain a forensic image of each digital storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data;

Attachment C

establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the United States avoided its obligations by destroying data or returning it to a third party.

Attachment C

# Exhibit 1

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Washington DC  20226*

April 12, 2013
www.atf.gov

903010
13-0096

Jason Davis, Esq.
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Mission Viejo, CA  92691

Re:  Ares Armor Metal Works, LLC

Dear Mr. Davis:

This responds to your letter dated January 31, 2013 to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) inquiring whether your client, Ares Armor Metal Works, LLC (AAMW), must obtain a Federal firearms license based on its proposed operations that you described in your letter.  As set forth below, AAMW would be engaged in the manufacture of firearms for the purpose of sale or distribution and, as a result, would be required by Federal law to be licensed as a manufacturer of firearms, and comply with all requirements for manufacturers, including placing identifying markings on firearms and maintaining permanent records of manufacture.

From the information you and your client provided, ATF understands that AAMW intends to maintain a business premises at which, for a fee, it makes available a computer numeric control (CNC) machine, tools, equipment, and instructions to persons who bring in castings or raw materials for the purpose of creating firearms.  AAMW does not provide the castings or raw materials.  The owner of the casting places it into AAMW's pre-programmed CNC machine and initiates the CNC machine to begin the operation.  During the course of completion of the pre-programmed operation, the casting or material requires repositioning.  Under the instruction and supervision of AAMW employees, once AAMW's CNC machine has completed a portion of the program upon each casting, an AAMW employee would clean the casting with compressed air and the owner of the casting removes or repositions the casting inside the CNC machine.  Under these circumstances, you assert that AAMW is not required to obtain a Federal firearms license because "ALL firearms used in the process are owned and under the custody and control of the individual attendee at all times."  You further contend that AAMW is not manufacturing firearms because AAMW does not own, or have custody or control over the casting or raw material.

Jason Davis, Esq.
Law Offices of Davis & Associates

The Gun Control Act of 1968 (GCA), Title 18, United States Code (U.S.C.), section 923(a), provides, in part, that no person shall engage in the business of importing, manufacturing, or dealing in firearms until he has filed an application with and received a license to do so from the Attorney General. A "firearm" is defined by 18 U.S.C. 921(a)(3) to include any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, and the frame or receiver of any such weapon. The term "manufacturer" is defined by 18 U.S.C. 921(a)(10) as any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution. As applied to a manufacturer of firearms, the term "engaged in the business" is defined by 18 U.S.C. 921(a)(21)(A) and 27 CFR 478.11, as a "person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." *See also* ATF Rul. 2010-10 (any activities that result in the making of firearms for sale or distribution, to include installing parts in or on firearm frames and receivers, and processes that primarily enhance a firearm's durability, constitute firearms manufacturing).

Under the facts presented, firearms will be manufactured at AAMW's business premises as a regular course of trade or business. Additionally, AAMW profits from the manufacture of the frames and receivers by charging a fee. The firearms are manufactured on AAMW's premises by AAMW's machines, AAMW provides plans and instructions on the manufacture of the firearms, and AAMW employees supervise the entire process. The fact that someone other than an employee initiates the automated process or repositions a casting does not negate AAMW's role as a manufacturer in this process. Here it is the machine that manufactures the firearm, not the consumer, and the ultimate control of that machine is not with the consumer but with AAMW. Under these circumstances, it is clear that AAMW devotes time, attention and labor to manufacturing firearms as a regular course of trade or business.[1]

While AAMW may not own the castings or finished articles, we disagree with your assertion that AAMW does not therefore make, or have custody or control over the finished firearms. Custody and control over a firearm is relevant only in that it may assist in determining whether there has been a "sale or distribution" of a firearm. From inception, AAMW has custody and control over all firearms produced inside its machines at its business premises. In fact, AAMW controls the entire manufacturing process. Following manufacture, AAMW distributes a firearm when it returns a completed firearm to the person who provided only a casting or raw material. The production of finished frames or receivers from castings constitutes the manufacture of firearms. AAMW is, therefore, engaged in the business of manufacturing firearms for sale or distribution.

Furthermore, your proposed manner of operation would result in the systemized production of numerous firearms without serial numbers and other required marks of identification, *see* 27 CFR 478.92, permanent records of manufacture, *see* 27 CFR 478.123, or firearms transaction records, *see* 27 CFR 478.124 and 125. In addition, your proposed manner of operation results in

---

[1] *Compare* TTB Ruling 2010-4 (9/30/10) (retailers who make available 'roll-your-own' cigarette making machines are manufacturers of cigarettes, rather than the consumers who place their tobacco and tubes in the machines, because those businesses control access to and use of their machines).

Jason Davis, Esq.
Law Offices of Davis & Associates

firearms being obtained by unlicensed individuals without undergoing a background check, pursuant to 27 CFR 478.102. That result is contrary to the intent of Congress in crafting the manufacturing provisions of the GCA. The record keeping and marking requirements associated with manufacturing firearms are critically important to public safety.

For the above reasons, AAMW is required to obtain a Federal license as a manufacturer of firearms other than destructive devices (Type 07) to conduct its proposed business operations, and abide by all requirements for licensed manufacturers under Federal law and regulations.[2]

We trust the foregoing has been responsive to your request. If you should have further questions, please contact the Firearms Industry Programs Branch at fipb@atf.gov or (202) 648-7190.

Sincerely,

*Debra S. Satkowiak*

Debra S. Satkowiak
Chief, Firearms and Explosives Industry Division


c:     Director, Industry Operations, Los Angeles Field Division
       Area Supervisor, San Diego III Field Office

---

[2] Note that a license as a dealer-gunsmith (Type 01) would not be sufficient because, under the statutory definition of "dealer," gunsmiths are persons who "are engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms." *See* 18 U.S.C. 921(a)(11)(B). Fabrication of a receiver from a casting or other raw material cannot be considered a repair, or making or fitting special barrels, stocks, or trigger mechanisms to existing firearms.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>23526 Rosewood Road,<br>Auburn, California | )<br>)<br>)<br>)<br>)<br>) |

Case No.   2: 1 3 - SW - 6 5 9    CKD

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     EASTERN     District of     CALIFORNIA    
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A-6

    The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

    **YOU ARE COMMANDED** to execute this warrant on or before        October 18, 2013       
                                                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
 Hon. Carolyn K. Delaney or duty magistrate judge     .
                   *(name)*

    ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for      days *(not to exceed 30)*.

                         ☐until, the facts justifying, the later specific date of             .

Date and time issued: 10/7/2013
                    10:15 am

                                     *Judge's signature*

City and state:    Sacramento, California             Hon. Carolyn K. Delaney, U.S. Magistrate Judge
                                                           *Printed name and title*